# OHIO *v.* ROBINETTE

No. 95–891.  Argued October 8, 1996—Decided November 18, 1996

34

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined. GINSBURG, J., filed an opinion concurring in the judgment, *post*, p. 40. STEVENS, J., filed a dissenting opinion, *post*, p. 45.

*Carley J. Ingram* argued the cause for petitioner. With her on the briefs was *Mathias H. Heck, Jr.*

*Irving L. Gornstein* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Days, Acting Assistant Attorney General Keeney, Deputy Solicitor General Dreeben, Paul A. Engelmayer,* and *Joseph C. Wyderko.*

*James D. Ruppert* argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *Betty D. Montgomery,* Attorney General of Ohio, *Jeffrey S. Sutton,* State Solicitor, and *Simon B. Karas,* and by the Attorneys General for their respective States as follows: *Jeff Sessions* of Alabama, *Daniel E. Lungren* of California, *Gale A. Norton* of Colorado, *M. Jane Brady* of Delaware, *Robert Butterworth* of Florida, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Jim Ryan* of Illinois, *Carla J. Stovall* of Kansas, *A. B. Chandler III* of Kentucky, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

We are here presented with the question whether the Fourth Amendment requires that a lawfully seized defendant must be advised that he is "free to go" before his consent to search will be recognized as voluntary. We hold that it does not.

This case arose on a stretch of Interstate 70 north of Dayton, Ohio, where the posted speed limit was 45 miles per hour because of construction. Respondent Robert D. Robinette was clocked at 69 miles per hour as he drove his car along this stretch of road, and was stopped by Deputy Roger Newsome of the Montgomery County Sheriff's Office. Newsome asked for and was handed Robinette's driver's license, and he ran a computer check which indicated that Robinette had no previous violations. Newsome then asked Robinette to step out of his car, turned on his mounted video camera, issued a verbal warning to Robinette, and returned his license.

At this point, Newsome asked, "One question before you get gone: [A]re you carrying any illegal contraband in your

of Nevada, *Jeffrey R. Howard* of New Hampshire, *Deborah T. Poritz* of New Jersey, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *W. A. Drew Edmondson* of Oklahoma, *Theodore Kulongoski* of Oregon, *Thomas W. Corbett, Jr.*, of Pennsylvania, *Jeffrey B. Pine* of Rhode Island, *Mark Bennett* of South Dakota, *Charles W. Bursen* of Tennessee, *Dan Morales* of Texas, *Jeffrey L. Amestoy* of Vermont, *James S. Gilmore III* of Virginia, *Darrell V. McGraw, Jr.*, of West Virginia, *James E. Doyle* of Wisconsin, and *William U. Hill* of Wyoming; and for Americans for Effective Law Enforcement, Inc., by *Fred E. Inbau, Wayne W. Schmidt, James P. Manak*, and *Bernard J. Farber.*

*Tracey Maclin, Steven R. Shapiro*, and *Jeffrey M. Gamso* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

Briefs of *amicus curiae* were filed for the National Association of Criminal Defense Lawyers by *Sheryl Gordon McCloud;* and for the Ohio Association of Criminal Defense Lawyers by *W. Andrew Hasselbach.*

car? Any weapons of any kind, drugs, anything like that?"
App. to Brief for Respondent 2 (internal quotation marks
omitted). Robinette answered "no" to these questions, after
which Deputy Newsome asked if he could search the car.
Robinette consented. In the car, Deputy Newsome discov-
ered a small amount of marijuana and, in a film container, a
pill which was later determined to be methylenedioxymeth-
amphetamine (MDMA). Robinette was then arrested and
charged with knowing possession of a controlled substance,
MDMA, in violation of Ohio Rev. Code Ann. § 2925.11(A)
(1993).

Before trial, Robinette unsuccessfully sought to suppress
this evidence. He then pleaded "no contest," and was found
guilty. On appeal, the Ohio Court of Appeals reversed, rul-
ing that the search resulted from an unlawful detention.
The Supreme Court of Ohio, by a divided vote, affirmed. 73
Ohio St. 3d 650, 653 N. E. 2d 695 (1995). In its opinion, that
court established a bright-line prerequisite for consensual
interrogation under these circumstances:

> "The right, guaranteed by the federal and Ohio Consti-
> tutions, to be secure in one's person and property re-
> quires that citizens stopped for traffic offenses be clearly
> informed by the detaining officer when they are free to
> go after a valid detention, before an officer attempts to
> engage in a consensual interrogation. Any attempt at
> consensual interrogation must be preceded by the
> phrase 'At this time you legally are free to go' or by
> words of similar import." *Id.*, at 650–651, 653 N. E. 2d,
> at 696.

We granted certiorari, 516 U. S. 1157 (1996), to review this
*per se* rule, and we now reverse.

We must first consider whether we have jurisdiction to
review the Ohio Supreme Court's decision. Respondent
contends that we lack such jurisdiction because the Ohio
decision rested upon the Ohio Constitution, in addition to the

Federal Constitution. Under *Michigan* v. *Long*, 463 U. S. 1032 (1983), when "a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so."\* *Id.,* at 1040–1041. Although the opinion below mentions Art. I, § 14, of the Ohio Constitution in passing (a section which reads identically to the Fourth Amendment), the opinion clearly relies on federal law nevertheless. Indeed, the only cases it discusses or even cites are federal cases, except for one state case which itself applies the Federal Constitution.

Our jurisdiction is not defeated by the fact that these citations appear in the body of the opinion, while, under Ohio law, "[the] Supreme Court speaks as a court only through the syllabi of its cases." See *Ohio* v. *Gallagher*, 425 U. S. 257, 259 (1976). When the syllabus, as here, speaks only in general terms of "the federal and Ohio Constitutions," it is permissible for us to turn to the body of the opinion to discern the grounds for decision. *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433 U. S. 562, 566 (1977).

Respondent Robinette also contends that we may not reach the question presented in the petition because the Supreme Court of Ohio also held, as set out in the syllabus paragraph (1):

"When the motivation behind a police officer's continued detention of a person stopped for a traffic violation is not related to the purpose of the original, constitutional stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some

---

\*Respondent and his *amici* ask us to take this opportunity to depart from *Michigan* v. *Long*. We are no more persuaded by this argument now than we were two Terms ago, see *Arizona* v. *Evans*, 514 U. S. 1 (1995), and we again reaffirm the *Long* presumption.

separate illegal activity justifying an extension of the detention, the continued detention constitutes an illegal seizure." 73 Ohio St. 3d, at 650, 653 N. E. 2d, at 696.

In reliance on this ground, the Supreme Court of Ohio held that when Newsome returned to Robinette's car and asked him to get out of the car, after he had determined in his own mind not to give Robinette a ticket, the detention then became unlawful.

Respondent failed to make any such argument in his brief in opposition to certiorari. See this Court's Rule 15.2. We believe the issue as to the continuing legality of the detention is a "predicate to an intelligent resolution" of the question presented, and therefore "fairly included therein." This Court's Rule 14.1(a); *Vance* v. *Terrazas*, 444 U. S. 252, 258–259, n. 5 (1980). The parties have briefed this issue, and we proceed to decide it.

We think that under our recent decision in *Whren* v. *United States*, 517 U. S. 806 (1996) (decided after the Supreme Court of Ohio decided the present case), the subjective intentions of the officer did not make the continued detention of respondent illegal under the Fourth Amendment. As we made clear in *Whren*, "'the fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.' . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.*, at 813 (quoting *Scott* v. *United States*, 436 U. S. 128, 138 (1978)). And there is no question that, in light of the admitted probable cause to stop Robinette for speeding, Deputy Newsome was objectively justified in asking Robinette to get out of the car, subjective thoughts notwithstanding. See *Pennsylvania* v. *Mimms*, 434 U. S. 106, 111, n. 6 (1977) ("We hold . . . that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out

of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures").

We now turn to the merits of the question presented. We have long held that the "touchstone of the Fourth Amendment is reasonableness." *Florida* v. *Jimeno*, 500 U. S. 248, 250 (1991). Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances.

In applying this test we have consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry. Thus, in *Florida* v. *Royer*, 460 U. S. 491 (1983), we expressly disavowed any "litmuspaper test" or single "sentence or . . . paragraph . . . rule," in recognition of the "endless variations in the facts and circumstances" implicating the Fourth Amendment. *Id.*, at 506. Then, in *Michigan* v. *Chesternut*, 486 U. S. 567 (1988), when both parties urged "bright-line rule[s] applicable to all investigatory pursuits," we rejected both proposed rules as contrary to our "traditional contextual approach." *Id.*, at 572–573. And again, in *Florida* v. *Bostick*, 501 U. S. 429 (1991), when the Florida Supreme Court adopted a *per se* rule that questioning aboard a bus always constitutes a seizure, we reversed, reiterating that the proper inquiry necessitates a consideration of "all the circumstances surrounding the encounter." *Id.*, at 439.

We have previously rejected a *per se* rule very similar to that adopted by the Supreme Court of Ohio in determining the validity of a consent to search. In *Schneckloth* v. *Bustamonte*, 412 U. S. 218 (1973), it was argued that such a consent could not be valid unless the defendant knew that he had a right to refuse the request. We rejected this argument: "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Id.*, at 227. And just as it "would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning," *id.*, at 231, so too would it be

unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary.

The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and "[v]oluntariness is a question of fact to be determined from all the circumstances," *id.*, at 248–249. The Supreme Court of Ohio having held otherwise, its judgment is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE GINSBURG, concurring in the judgment.

Robert Robinette's traffic stop for a speeding violation on an interstate highway in Ohio served as prelude to a search of his automobile for illegal drugs. Robinette's experience was not uncommon in Ohio. As the Ohio Supreme Court related, the sheriff's deputy who detained Robinette for speeding and then asked Robinette for permission to search his vehicle "was on drug interdiction patrol at the time." 73 Ohio St. 3d 650, 651, 653 N. E. 2d 695, 696 (1995). The deputy testified in Robinette's case that he routinely requested permission to search automobiles he stopped for traffic violations. *Ibid.* According to the deputy's testimony in another prosecution, he requested consent to search in 786 traffic stops in 1992, the year of Robinette's arrest. *State* v. *Retherford*, 93 Ohio App. 3d 586, 594, n. 3, 639 N. E. 2d 498, 503, n. 3, dism'd, 69 Ohio St. 3d 1488, 635 N. E. 2d 43 (1994).

From their unique vantage point, Ohio's courts observed that traffic stops in the State were regularly giving way to contraband searches, characterized as consensual, even when officers had no reason to suspect illegal activity. One Ohio appellate court noted: "[H]undreds, and perhaps thousands of Ohio citizens are being routinely delayed in their travels and asked to relinquish to uniformed police officers their

right to privacy in their automobiles and luggage, sometimes for no better reason than to provide an officer the opportunity to 'practice' his drug interdiction technique." 93 Ohio App. 3d, at 594, 639 N. E. 2d, at 503 (footnote omitted).

Against this background, the Ohio Supreme Court determined, and announced in Robinette's case, that the federal and state constitutional rights of Ohio citizens to be secure in their persons and property called for the protection of a clear-cut instruction to the State's police officers: An officer wishing to engage in consensual interrogation of a motorist at the conclusion of a traffic stop must first tell the motorist that he or she is free to go. The Ohio Supreme Court described the need for its first-tell-then-ask rule this way:

> "The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. . . .
>
> . . . . .
>
> "Most people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him.
>
> . . . . .
>
> "While the legality of consensual encounters between police and citizens should be preserved, we do not believe that this legality should be used by police officers to turn a routine traffic stop into a fishing expedition for unrelated criminal activity. The Fourth Amendment to the federal Constitution and Section 14, Article I of the Ohio Constitution exist to protect citizens against such an unreasonable interference with their liberty." 73 Ohio St. 3d, at 654–655, 653 N. E. 2d, at 698–699.

Today's opinion reversing the decision of the Ohio Supreme Court does not pass judgment on the wisdom of the first-tell-then-ask rule. This Court's opinion simply clarifies that the Ohio Supreme Court's instruction to police officers in Ohio is not, under this Court's controlling jurisprudence, the command of the Federal Constitution. See *ante*, at 39–40. The Ohio Supreme Court invoked both the Federal Constitution and the Ohio Constitution without clearly indicating whether state law, standing alone, independently justified the court's rule. The ambiguity in the Ohio Supreme Court's decision renders this Court's exercise of jurisdiction proper under *Michigan* v. *Long*, 463 U. S. 1032, 1040–1042 (1983), and this Court's decision on the merits is consistent with the Court's "totality of the circumstances" Fourth Amendment precedents, see *ante*, at 39. I therefore concur in the Court's judgment.

I write separately, however, because it seems to me improbable that the Ohio Supreme Court understood its first-tell-then-ask rule to be the Federal Constitution's mandate for the Nation as a whole. "[A] State is free *as a matter of its own law* to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards." *Oregon* v. *Hass*, 420 U. S. 714, 719 (1975).\* But ordinarily, when a state high court grounds a rule of criminal procedure in the Federal Constitution, the

---

\*Formerly, the Ohio Supreme Court was "reluctant to use the Ohio Constitution to extend greater protection to the rights and civil liberties of Ohio citizens" and had usually not taken advantage of opportunities to "us[e] the Ohio Constitution as an independent source of constitutional rights." *Arnold* v. *Cleveland*, 67 Ohio St. 3d 35, 42, n. 8, 616 N. E. 2d 163, 168, n. 8 (1993). Recently, however, the state high court declared: "The Ohio Constitution is a document of independent force. . . . As long as state courts provide at least as much protection as the United States Supreme Court has provided in its interpretation of the federal Bill of Rights, state courts are unrestricted in according greater civil liberties and protections to individuals and groups." *Id.*, at 35, 616 N. E. 2d, at 164 (syllabus).

court thereby signals its view that the Nation's Constitution would require the rule in all 50 States. Given this Court's decisions in consent-to-search cases such as *Schneckloth* v. *Bustamonte*, 412 U. S. 218 (1973), and *Florida* v. *Bostick*, 501 U. S. 429 (1991), however, I suspect that the Ohio Supreme Court may not have homed in on the implication ordinarily to be drawn from a state court's reliance on the Federal Constitution. In other words, I question whether the Ohio court thought of the strict rule it announced as a rule for the governance of police conduct not only in Miami County, Ohio, but also in Miami, Florida.

The first-tell-then-ask rule seems to be a prophylactic measure not so much extracted from the text of any constitutional provision as crafted by the Ohio Supreme Court to reduce the number of violations of textually guaranteed rights. In *Miranda* v. *Arizona*, 384 U. S. 436 (1966), this Court announced a similarly motivated rule as a minimal national requirement without suggesting that the text of the Federal Constitution required the precise measures the Court's opinion set forth. See *id.*, at 467 ("[T]he Constitution [does not] necessarily requir[e] adherence to any particular solution" to the problems associated with custodial interrogations.); see also *Oregon* v. *Elstad*, 470 U. S. 298, 306 (1985) ("The *Miranda* exclusionary rule . . . sweeps more broadly than the Fifth Amendment itself."). Although all parts of the United States fall within this Court's domain, the Ohio Supreme Court is not similarly situated. That court can declare prophylactic rules governing the conduct of officials in Ohio, but it cannot command the police forces of sister States. The very ease with which the Court today disposes of the federal leg of the Ohio Supreme Court's decision strengthens my impression that the Ohio Supreme Court saw its rule as a measure made for Ohio, designed to reinforce in that State the right of the people to be secure against unreasonable searches and seizures.

The Ohio Supreme Court's syllabus and opinion, however, were ambiguous.   Under *Long*, the existence of ambiguity regarding the federal- or state-law basis of a state-court decision will trigger this Court's jurisdiction.   *Long* governs even when, all things considered, the more plausible reading of the state court's decision may be that the state court did not regard the Federal Constitution alone as a sufficient basis for its ruling.   Compare *Arizona* v. *Evans*, 514 U. S. 1, 7–9 (1995), with *id.*, at 31–33 (GINSBURG, J., dissenting).

It is incumbent on a state court, therefore, when it determines that its State's laws call for protection more complete than the Federal Constitution demands, to be clear about its ultimate reliance on state law.   Similarly, a state court announcing a new legal rule arguably derived from both federal and state law can definitively render state law an adequate and independent ground for its decision by a simple declaration to that effect.   A recent Montana Supreme Court opinion on the scope of an individual's privilege against self-incrimination includes such a declaration:

> "While we have devoted considerable time to a lengthy discussion of the application of the Fifth Amendment to the United States Constitution, it is to be noted that this holding is also based separately and independently on [the defendant's] right to remain silent pursuant to Article II, Section 25 of the Montana Constitution." *State* v. *Fuller*, 276 Mont. 155, 167, 915 P. 2d 809, 816, cert. denied, *post*, p. 930.

An explanation of this order meets the Court's instruction in *Long* that "[i]f the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, [this Court] will not undertake to review the decision."   463 U. S., at 1041.

On remand, the Ohio Supreme Court may choose to clarify that its instructions to law enforcement officers in Ohio find

adequate and independent support in state law, and that in issuing these instructions, the court endeavored to state dispositively only the law applicable in Ohio. See *Evans*, 514 U. S., at 30–34 (GINSBURG, J., dissenting). To avoid misunderstanding, the Ohio Supreme Court must itself speak with the clarity it sought to require of its State's police officers. The efficacy of its endeavor to safeguard the liberties of Ohioans without disarming the State's police can then be tested in the precise way Our Federalism was designed to work. See, *e. g.*, Kaye, State Courts at the Dawn of a New Century: Common Law Courts Reading Statutes and Constitutions, 70 N. Y. U. L. Rev. 1, 11–18 (1995); Linde, First Things First: Rediscovering the States' Bills of Rights, 9 U. Balt. L. Rev. 379, 392–396 (1980).

JUSTICE STEVENS, dissenting.

The Court's holding today is narrow: The Federal Constitution does not require that a lawfully seized person be advised that he is "free to go" before his consent to search will be recognized as voluntary. I agree with that holding. Given the Court's reading of the opinion of the Supreme Court of Ohio, I also agree that it is appropriate for the Court to limit its review to answering the sole question presented in the State's certiorari petition.[1] As I read the state-court opinion, however, the prophylactic rule announced in the second syllabus was intended as a guide to the decision of future cases rather than an explanation of the decision in this case. I would therefore affirm the judgment of the Supreme Court of Ohio because it correctly held that respondent's consent to the search of his vehicle was the product of an unlawful detention. Moreover, it is important

---

[1] "Whether the Fourth Amendment to the United States Constitution requires police officers to inform motorists, lawfully stopped for traffic violations, that the legal detention has concluded before any subsequent interrogation or search will be found to be consensual?" Pet. for Cert. i.

to emphasize that nothing in the Federal Constitution—or in this Court's opinion—prevents a State from requiring its law enforcement officers to give detained motorists the advice mandated by the Ohio court.

I

The relevant facts are undisputed.[2] Officer Newsome stopped respondent because he was speeding. Neither at the time of the stop nor at any later time prior to the search of respondent's vehicle did the officer have any basis for believing that there were drugs in the car. After ordering respondent to get out of his car, issuing a warning, and returning his driver's license, Newsome took no further action related to the speeding violation. He did, however, state: "One question before you get gone: are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" Thereafter, he obtained respondent's consent to search the car.

These facts give rise to two questions of law: whether respondent was still being detained when the "one question" was asked, and, if so, whether that detention was unlawful. In my opinion the Ohio Appellate Court and the Ohio Supreme Court correctly answered both of those questions.

The Ohio Supreme Court correctly relied upon *United States* v. *Mendenhall*, 446 U. S. 544 (1980),[3] which stated that "a person has been 'seized' within the meaning of the Fourth Amendment . . . if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.*, at 554 (opinion of Stewart, J.); see *Michigan* v. *Chesternut*, 486 U. S. 567, 573 (1988) (noting that "[t]he Court has since embraced this test"). See also *Florida* v. *Bostick*, 501 U. S. 429, 435–436 (1991) (applying variant of this approach). The Ohio Court

---

[2] This is in part because crucial portions of the exchange were videotaped; this recording is a part of the record.

[3] See 73 Ohio St. 3d 650, 654, 653 N. E. 2d 695, 698 (1995).

of Appeals applied a similar analysis. See App. to Pet. for Cert. 17–18.

Several circumstances support the Ohio courts' conclusion that a reasonable motorist in respondent's shoes would have believed that he had an obligation to answer the "one question" and that he could not simply walk away from the officer, get back in his car, and drive away. The question itself sought an answer *"before* you get gone." In addition, the facts that respondent had been detained, had received no advice that he was free to leave, and was then standing in front of a television camera in response to an official command are all inconsistent with an assumption that he could reasonably believe that he had no duty to respond. The Ohio Supreme Court was surely correct in stating: "Most people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him." 73 Ohio St. 3d, at 655, 653 N. E. 2d, at 698.[4]

Moreover, as an objective matter it is fair to presume that most drivers who have been stopped for speeding are in a hurry to get to their destinations; such drivers have no interest in prolonging the delay occasioned by the stop just to engage in idle conversation with an officer, much less to allow

---

[4] A learned commentator has expressed agreement on this point. See 4 W. LaFave, Search and Seizure § 9.3(a), p. 112 (3d ed. 1996 and Supp. 1997) ("Given the fact that [defendant] quite clearly had been seized when his car was pulled over, the return of the credentials hardly manifests a change in status when it was immediately followed by interrogation concerning other criminal activity"); see also *ibid.* (approving of Ohio Supreme Court's analysis in this case). We have indicated as much ourselves in the past. See *Berkemer* v. *McCarty,* 468 U. S. 420, 436 (1984) ("Certainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so").

a potentially lengthy search.[5]  I also assume that motorists—even those who are not carrying contraband—have an interest in preserving the privacy of their vehicles and possessions from the prying eyes of a curious stranger.  The fact that this particular officer successfully used a similar method of obtaining consent to search roughly 786 times in one year, *State* v. *Retherford*, 93 Ohio App. 3d 586, 591–592, 639 N. E. 2d 498, 502, dism'd, 69 Ohio St. 3d 1488, 635 N. E. 2d 43 (1994), indicates that motorists generally respond in a manner that is contrary to their self-interest.  Repeated decisions by ordinary citizens to surrender that interest cannot satisfactorily be explained on any hypothesis other than an assumption that they believed they had a legal duty to do so.

The Ohio Supreme Court was therefore entirely correct to presume in the first syllabus preceding its opinion that a "continued detention" was at issue here.  73 Ohio St. 3d, at 650, 653 N. E. 2d, at 696.[6]  The Ohio Court of Appeals reached a similar conclusion.  In response to the State's con-

---

[5] Though this search does not appear to have been particularly intrusive, that may not always be so.  See Brief for American Civil Liberties Union et al. as *Amici Curiae* 28–29.  Indeed, our holding in *Florida* v. *Jimeno*, 500 U. S. 248 (1991), allowing police to open closed containers in the context of an automobile consent search where the "consent would reasonably be understood to extend to a particular container," *id.,* at 252, ensures that many motorists will wind up "consenting" to a far broader search than they might have imagined.  See *id.,* at 254–255 ("only objection that the police could have to" a rule requiring police to seek consent to search containers as well as the automobile itself "is that it would prevent them from exploiting the ignorance of a citizen who simply did not anticipate that his consent to search the car would be understood to authorize the police to rummage through his packages") (Marshall, J., dissenting).

[6] It is ordinarily the syllabus that precedes an Ohio Supreme Court opinion, rather than the opinion itself, that states the law of the case.  *Cassidy* v. *Glossip*, 12 Ohio St. 2d 17, 24, 231 N. E. 2d 64, 68 (1967); see *Migra* v. *Warren City School Dist. Bd. of Ed.*, 465 U. S. 75, 86, n. 8 (1984); *Ohio* v. *Gallagher*, 425 U. S. 257, 259 (1976).

tention that Robinette "was free to go" at the time consent was sought, that court held—after reviewing the record—that "a reasonable person in Robinette's position would not believe that the investigative stop had been concluded, and that he or she was free to go, so long as the police officer was continuing to ask investigative questions." App. to Pet. for Cert. 17–18. As I read the Ohio opinions, these determinations were independent of the bright-line rule criticized by the majority.[7] I see no reason to disturb them.

In the first syllabus, the Ohio Supreme Court also answered the question whether the officer's continued detention of respondent was lawful or unlawful. See *ante*, at 37–38. Although there is a possible ambiguity in the use of the word "motivation" in the Ohio Supreme Court's explanation of why the traffic officer's continued detention of respondent was an illegal seizure, the first syllabus otherwise was a correct statement of the relevant federal rule as well as the relevant Ohio rule. As this Court points out in its opinion, as a matter of federal law the subjective motivation of the officer does not determine the legality of a detention. Because I assume that the learned judges sitting on the Ohio Supreme Court were well aware of this proposition, we should construe the syllabus generously by replacing the ambiguous term "motivation behind" with the term "justification for" in order to make the syllabus unambiguously state the correct rule of federal law. So amended, the controlling proposition of federal law reads:

> "When the [justification for] a police officer's continued detention of a person stopped for a traffic violation is

---

[7] Indeed, the first paragraph of the Ohio Supreme Court's opinion clearly indicates that the bright-line rule was meant to apply only in *future* cases. The Ohio Supreme Court first explained: "We find that the search was invalid since it was the product of an unlawful seizure." 73 Ohio St. 3d, at 652, 653 N. E. 2d, at 697. Only then did the court proceed to point out that it would "also use this case to establish a bright-line test . . . ." *Ibid.*

not related to the purpose of the original, constitutional
stop, and when that continued detention is not based on
any articulable facts giving rise to a suspicion of some
separate illegal activity justifying an extension of the
detention, the continued detention constitutes an illegal
seizure." 73 Ohio St. 3d, at 650, 653 N. E. 2d, at 696.

Notwithstanding that the subjective motivation for the
officer's decision to stop respondent related to drug inter-
diction, the legality of the stop depended entirely on the fact
that respondent was speeding. Of course, "[a]s a general
matter, the decision to stop an automobile is reasonable
where the police have probable cause to believe that a traffic
violation has occurred." *Whren* v. *United States*, 517 U. S.
806, 810 (1996). As noted above, however, by the time Robi-
nette was asked for consent to search his automobile, the
lawful traffic stop had come to an end; Robinette had been
given his warning, and the speeding violation provided no
further justification for detention. The continued detention
was therefore only justifiable, if at all, on some other
grounds.[8]

At no time prior to the search of respondent's vehicle did
any articulable facts give rise to a reasonable suspicion of
some separate illegal activity that would justify further
detention. See *United States* v. *Sharpe*, 470 U. S. 675, 682
(1985); *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 881–
882 (1975); *Terry* v. *Ohio*, 392 U. S. 1, 21 (1968). As an objec-
tive matter, it inexorably follows that when the officer had
completed his task of either arresting or reprimanding the
driver of the speeding car, his continued detention of that

---

[8] Cf. *Florida* v. *Royer*, 460 U. S. 491, 500 (1983) (plurality opinion) ("[A]n
investigative detention must be temporary and last no longer than is nec-
essary to effectuate the purpose of the stop"); *United States* v. *Brignoni-
Ponce*, 422 U. S. 873, 881 (1975) ("stop and inquiry must be 'reasonably
related in scope to the justification for their initiation'" (quoting *Terry* v.
*Ohio*, 392 U. S. 1, 29 (1968)).

person constituted an illegal seizure. This holding by the Ohio Supreme Court is entirely consistent with federal law.[9]

The proper disposition follows as an application of well-settled law. We held in *Florida* v. *Royer*, 460 U. S. 491 (1983), that a consent obtained during an illegal detention is ordinarily ineffective to justify an otherwise invalid search.[10] See also *Florida* v. *Bostick*, 501 U. S., at 433–434 (noting that if consent was given during the course of an unlawful seizure, the results of the search "must be suppressed as tainted fruit"); *Dunaway* v. *New York*, 442 U. S. 200, 218–219 (1979); *Brown* v. *Illinois*, 422 U. S. 590, 601–602 (1975). Cf. *Wong Sun* v. *United States*, 371 U. S. 471 (1963). Because Robinette's consent to the search was the product of an unlawful detention, "the consent was tainted by the illegality and was ineffective to justify the search." *Royer*, 460 U. S., at 507–508 (plurality opinion). I would therefore affirm the judgment below.

## II

A point correctly raised by JUSTICE GINSBURG merits emphasis. The Court's opinion today does not address either the wisdom of the rule announced in the second syllabus pre-

---

[9] Since "this Court reviews judgments, not opinions," *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984), the Ohio Supreme Court's holding that Robinette's continued seizure was illegal on these grounds provides a sufficient basis for affirming its judgment.

[10] Writing for a plurality of the Court, Justice White explained that "statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will." 460 U. S., at 501. The defendant in *Royer* had been "illegally detained when he consented to the search." *Id.*, at 507. As a result, the plurality agreed that "the consent was tainted by the illegality and was ineffective to justify the search." *Id.*, at 507–508. Concurring in the result, Justice Brennan agreed with this much of the plurality's decision, diverging on other grounds. See *id.*, at 509. Justice Brennan's agreement on that narrow principle represents the holding of the Court. See *Marks* v. *United States*, 430 U. S. 188, 193 (1977).

ceding the Ohio Supreme Court's opinion or the validity of that rule as a matter of Ohio law. Nevertheless the risk that the narrowness of the Court's holding may not be fully understood prompts these additional words.

There is no rule of federal law that precludes Ohio from requiring its police officers to give its citizens warnings that will help them to understand whether a valid traffic stop has come to an end, and will help judges to decide whether a reasonable person would have felt free to leave under the circumstances at issue in any given case.[11] Nor, as I have previously observed, is there anything "in the Federal Constitution that prohibits a State from giving lawmaking power to its courts." *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 479, and n. 3 (1981) (dissenting opinion). Thus, as far as we are concerned, whether Ohio acts through one branch of its government or another, it has the same power to enforce a warning rule as other States that may adopt such rules by executive action.[12]

---

[11] Indeed, we indicated in *Florida* v. *Bostick*, 501 U. S. 429, 437 (1991), that the fact a defendant had been explicitly advised that he could refuse to give consent was relevant to the question whether he was seized at the time consent was sought. And, in other cases, we have stressed the importance of similar advice as a circumstance supporting the conclusion that a consent to search was voluntary. See *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 227 (1973); *United States* v. *Mendenhall*, 446 U. S. 544, 558–559 (1980). Cf. *Washington* v. *Chrisman*, 455 U. S. 1, 9 (1982) (consent to search was voluntary where defendant "consented, in writing, . . . after being advised that his consent must be voluntary and that he had an absolute right to refuse consent").

[12] As we are informed by a brief *amicus curiae* filed by Americans For Effective Law Enforcement, Inc.: "Such a warning may be good police practice, and indeed *amicus* knows that many law enforcement agencies among our constituents have routinely incorporated a warning into their Fourth Amendment consent forms that they use in the field, but it is precisely that—a *practice* and *not a constitutional imperative.* An officer who includes such a warning in his request for consent undoubtedly presents a stronger case for a finding of voluntariness in a suppression hearing, and we would not suggest that such agencies and officers do other-

Moreover, while I recognize that warning rules provide benefits to the law enforcement profession and the courts, as well as to the public, I agree that it is not our function to pass judgment on the wisdom of such rules. Accordingly, while I have concluded that the judgment of the Supreme Court of Ohio should be affirmed, and thus dissent from this Court's disposition of the case, I am in full accord with its conclusion that the Federal Constitution neither mandates nor prohibits the warnings prescribed by the Ohio Court. Whether such a practice should be followed in Ohio is a matter for Ohio lawmakers to decide.

---

wise. We know, too, that instructors in many police training programs of leading universities and management institutes routinely recommend such warnings as a sound practice, likely to bolster the voluntariness of a consent to search. [We ourselves] conduc[t] law enforcement training programs at the national level and many of our own speakers have made this very point." Brief for Americans For Effective Law Enforcement, Inc., as *Amicus Curiae* 7.