558 S.E.2d 582

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Phillip Don WILLIAMS, Defendant Below, Appellant.**

**No. 29002.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 18, 2001.

Decided Oct. 25, 2001.

---

**6.** MAG. CTS. R. CRIM. P.R. 7(b), 8.

**10.** Such a prosecution is barred in the case sub judice by the one-year statute of limitations governing misdemeanors generally. W.Va.Code § 61–11–9 (1923) (Repl.Vol.2000).

**586**

Darrell V. McGraw, Jr., Attorney General, Heather D. Foster, Assistant Attorney General, Charleston, for the Appellee.

David C. Smith, Smith & Scantlebury, L.C., Bluefield, for the Appellant.

PER CURIAM.

Phillip Don Williams (hereinafter "Appellant") appeals the April 10, 2000, order of the Circuit Court of Mercer County denying his motion for a new trial and imposing a one-to-fifteen year prison sentence and a $25,000 fine for his conviction, after trial by jury, of possession with intent to deliver a Schedule II controlled substance, namely cocaine, in violation of West Virginia Code § 60A–4–401 (1971) (Repl.Vol.2000). Appellant claims the trial court erred in finding that law enforcement officers had a constitutional basis for conducting a pat down or frisk of his person and therefore wrongly allowed evidence from the search to be admitted at trial. He further contends that the evidence presented,

1. Appellant had initially also alleged a conspiracy occurring at the West Virginia State Police Forensic Laboratory as a basis for reversal of his conviction but later conceded that this issue was not presently mature for review.

2. Even though Appellant was not stopped by the officer, the officer asked for and obtained Appel-

particularly with regard to the element of intent to deliver, was insufficient to support his conviction.[1]

Based upon the briefs and arguments of the parties and thorough review of the record, we affirm Appellant's conviction.

I. Factual and Procedural Background

Around 10:00 or 11:00 p.m. on July 3, 1999, Appellant and his girlfriend, Louise Eaves, were en route to a motel in Virginia from Bluefield, West Virginia. Appellant was driving his motorcycle with Ms. Eaves following him in a late model sedan. About a quarter of a mile from the Virginia state line, Ms. Eaves was stopped by Officer Robert Mason of the Bluefield Police Department for following the motorcycle too closely. Appellant stopped his motorcycle when his girlfriend was pulled over, and walked back to the driver's side of her car where Officer Mason was questioning Ms. Eaves. According to the officer, even though Appellant was asked repeatedly to return to his motorcycle or move to the front of the car, Appellant kept returning to the driver's side of the car where Mason and Eaves were conversing. Appellant maintained that Mason never asked him to leave the immediate area.

Ms. Eaves could not produce a driver's license when asked to do so by Officer Mason, so the officer asked for her full name, social security number and date of birth in order to "run a check" by radio communication with police headquarters. The check revealed that Ms. Eaves did not have an operator's license, and Officer Mason issued a citation to her for driving without a license.[2] Officer Mason apparently radioed for backup sometime between stopping the car and checking the licenses, and two backup officers from the Bluefield Police Department arrived at the scene while Mason was writing the ticket. Mason said that the reason he called for backup was because Appel-

lant's driver's license in order to determine if there were any outstanding warrants involving him. None were reported. The registration check of the vehicle itself showed that it belonged to someone other than Eaves or Appellant.

lant would not leave the area as directed, which the officer felt was suspicious behavior.

The State's account of what subsequently occurred varies from Appellant's rendition. The State's evidence disclosed the following scenario through the testimony of Officer Mason and one of the backup officers, Officer Kahle.[3] Officer Kahle testified at the suppression hearing and at the trial that he had learned from a dispatcher on the way to the scene that an anonymous tip had been received stating that Ms. Eaves was transporting drugs. After Kahle arrived at the scene, he informed Mason about the tip; Mason then asked Ms. Eaves for consent to search the car. Kahle related that Eaves agreed to the search once Appellant nodded his approval. Mason's testimony at the suppression hearing and during the trial established that, after Eaves consented to the search of the vehicle, Mason asked Eaves to step out of the car for the purpose of performing a "protective pat down." Officer Mason's frisk[4] of Eaves produced nothing. According to both officers, Officer Kahle began the frisk of Appellant, but Appellant would not keep his hands on the hood of the car even after both Mason and Kahle ordered him to do so. Appellant then shoved his left hand into his left pocket, and the officers contended that they feared Appellant was reaching for a weapon. In response, Officer Mason drew his gun and Officer Kahle moved Appellant to the ground and handcuffed him. Once handcuffed, Kahle removed a utility knife from Appellant's pocket. Kahle and Mason then moved Appellant to his feet so that they could complete the frisk with Appellant standing. No other weapons were found. Mason testified that, after the frisk was completed, Appellant pulled something out of his back pocket, dropped it to the ground and began grinding it under his shoe. When the officers moved Appellant away from where he had been standing, Mason said that he saw an off-white substance in a paper towel on the ground. Mason's field test of the substance showed it was cocaine base.[5] Mason testified that Appellant was then arrested and fully searched. The search produced $3,317 in cash, $335 in food stamps, a $40 "blank" money order, a motel receipt and a notepad.

Appellant's testimony at trial depicted a different series of events. Appellant noted that he and Ms. Eaves complied with every request made by Officer Mason, including consenting to a search of the car, which Appellant maintained was completed before the backup officers arrived at the scene. Appellant also asserted that he and Officer Mason had a congenial exchange; however, the mood changed when the two backup officers arrived. According to Appellant, one backup officer ordered him to put his hands on the hood of the car because they were going to "pat search" him, but he could not keep his hands on the hood of the car at all times because it was hot. Appellant also contended that instead of conducting a frisk, the officer reached into Appellant's pockets. In an effort to assist the officer, Appellant asserted that he put his hand in his left pocket to remove the contents for the officer. According to Appellant, this gesture resulted in the officer throwing him to the ground, handcuffing him and completing a full search of his person while he was on the ground. Appellant acknowledged having a utility knife in his left pocket but contended that he had no cocaine and none was found on his person despite the thorough search conducted by the officer. Furthermore, Appellant said that the manner in which he was handcuffed made it impossible for him to remove anything from his back pockets. He also contended that the cocaine later found on the ground did not belong to him, may have been on the ground from the time that the stop

---

3. Officer John Kahle was one of two Bluefield Police Department patrolmen responding to Officer Mason's request for assistance.

4. As used in this opinion, the term "frisk" means "contact of the outer clothing of a person to detect by the sense of touch whether a concealed weapon is being carried." BLACK'S LAW DICTIONARY 668 (6th ed.1990).

5. Testimony by a West Virginia State Police Forensic Laboratory employee at trial confirmed that the substance was cocaine base with a total weight of approximately 14.5 grams or nearly 1/2 ounce.

was initiated or could have been planted there afterward by the officers.

Following his arrest, Appellant was charged by criminal complaint in magistrate court on July 4, 1999, with the felony offense of possession with intent to deliver a controlled substance. A preliminary hearing was held on July 22, 1999, at which the magistrate found probable cause to bind Appellant over to the grand jury on the felony charge.[6] A Mercer County grand jury returned a one count indictment on October 13, 1999, charging Appellant with the offense of possession with intent to deliver a Schedule II controlled substance (cocaine) in violation of West Virginia Code § 60A-4-401.

In a pretrial motion to suppress, filed on October 26, 1999, the defense challenged the admissibility of evidence seized at the scene, asserting that the search of Appellant was unconstitutional because it was conducted in conformity with a police agency policy rather than in response to the circumstances raising fear of officer safety. At the suppression hearing conducted by the circuit judge on December 6, 1999, the only evidence introduced was the testimony of Officer Mason and Officer Kahle.

The motion to suppress was denied at a January 24, 2000, decision conference at which the circuit judge found that the search was justified for the protection of the officers because the totality of the circumstances established reasonable suspicion. The case proceeded to a two-day jury trial which began on January 27, 2000. The jury returned a verdict of guilty of felony possession with intent to deliver a Schedule II controlled substance as charged in the indictment.[7]

On April 10, 2000, a hearing was held on the defense motion for a new trial at which Appellant renewed his argument that the frisk and subsequent search was unlawful, illegal and unconstitutional because it was conducted pursuant to departmental policy rather than a reasonable suspicion grounded

in specific and articulable facts. The circuit judge denied the motion and proceeded to sentencing. The April 10, 2000, sentencing order imposed a prison sentence for an indeterminate term of one to fifteen years and a fine of $25,000. It is from this order that Appellant now appeals.

## II. Standard of Review

 Issues involving motions to suppress evidence are reviewed according to the standards set forth in syllabus points one and two of *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996):

When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*. Similarly, an appellate court reviews *de novo* whether a search warrant was too broad. Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake has been made.

*Id.* at 107, 468 S.E.2d at 722.

 Our standard of review of challenges to the sufficiency of evidence to uphold a conviction was summarized in *State v.*

---

**6.** At the same time the felony offense complaint was filed, a separate complaint was filed in magistrate court charging the misdemeanor offense of obstructing an officer. The obstruction charge was dismissed at the preliminary hearing upon request of the prosecutor.

**7.** The verdict form supplied to the jury listed three alternative verdicts: guilty of the felony offense of possession with intent to deliver as charged in the indictment, guilty of the misdemeanor offense of possession, or not guilty.

*Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995) as:

> An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, syl. pt. 3, in part.

### III. Discussion

The first issue raised in this appeal is whether the frisk or pat down of Appellant by the police officers prior to an arrest and without a search warrant constituted a reasonable search and seizure under the Fourth Amendment to the United States Constitution and Article III, § 6 of the West Virginia Constitution. Appellant asserts the frisk was not proper in this instance because the officers' sole motivation in conducting the search was a police department policy which indiscriminately requires officers, after receiving consent to search a vehicle, to frisk the occupant(s) of the vehicle.

The United States Supreme Court set forth in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the circumstances under which a frisk or pat down is permissible under federal constitutional provisions.

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encoun-

ter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

*Id.* at 30–31, 88 S.Ct. at 1884–1885.

In concluding that a brief search or frisk for concealed weapons is permissible under our state constitution and the *Terry* ruling, this Court said:

> Where a police officer making a lawful investigatory stop has reason to believe that an individual is armed and dangerous, that officer, in order to protect himself and others, may conduct a search for concealed weapons, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be certain that the individual is armed; the inquiry is whether a reasonably prudent man would be warranted in the belief that his safety or that of others was endangered. *U.S. Const.* amend. IV. *W.Va. Const.* art. III, § 6.

Syl. Pt. 3, *State v. Choat,* 178 W.Va. 607, 363 S.E.2d 493 (1987).

Clearly, the critical factor in determining whether a frisk or pat down of an individual is reasonable under our federal and state constitutions is whether the officer, at the time the decision to perform the limited search was made, had justification for being concerned about his and others safety because he had a basis for suspecting the subject of the frisk was armed and dangerous. A police officer, therefore, "must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. The fact specific nature of the reasonableness inquiry surrounding a frisk places the burden on a police officer to make an individualized assessment regarding safety concerns in an investigatory stop situation before anyone is searched.

■ In the case before us, Officer Mason made the initial stop because he observed a traffic violation.[8] He testified at the suppression hearing that after the traffic stop he had advised Appellant several times to return to his motorcycle and that Appellant "went back from his motorcycle to the car, back and forth to the area where I was to the front of the car, to the motorcycle, back and forth." Mason indicated that he radioed for backup assistance because of this suspicious behavior. Mason admitted that Appellant was polite and otherwise cooperative prior to the frisk. In explaining why a frisk was conducted, Mason said that as a matter of policy taught at the West Virginia State Police Academy, "anytime we do a search of a vehicle we pat down any occupants, anybody that has anything to do with that vehicle we pat everyone down for weapons for our safety." Officer Kahle's testimony at the suppression hearing established that he recognized Appellant when he arrived at the scene and knew that Appellant owned guns because he had previously reported them stolen. He also had observed that Ms. Eaves and Appellant appeared very nervous, adding that Appellant was perspiring heavily even though it was not a particularly warm night. Speaking to the safety concerns underlying the "policy to do a protective search" before a vehicle search is conducted, Kahle said, "[w]hen we're in a car searching it a lot of times our heads are down under a seat and you can't see the other occupants, they could easily pull a weapon out and shoot you in the back, a lot of stuff could happen." In response to the question of why officer safety was not a concern prior to the vehicle search, Kahle said "the safety concern is—is a little less than what it is when you have two officers inside the car and one officer standin' outside there [watching the subjects]."

We now apply the objective test of *Choat* to the officers' testimony. Although the record is not replete with evidence, we find that the officers' testimony related specific facts which would warrant a reasonably prudent man to believe that his safety or that of others was endangered. The incident occurred late at night and Appellant would not follow the officers' repeated directives to leave the immediate scene. At least one of the officers knew that Appellant owned guns. Furthermore, the two officers engaged in the search of the vehicle would be in a vulnerable position since only one officer would be watching the couple. Under the totality of circumstances in this case, we cannot say that the fear for safety was unwarranted, nor can we find that the lower court's denial of the motion to suppress was a clear mistake.

■ We have found that the decision to conduct a limited search was justified under the applicable constitutional standards in the particular circumstances of the instant case. We emphasize that a "blanket policy" of a law enforcement agency is not a substitute for the requirements of *Terry* and *Choat* that law enforcement officers observe conduct or other circumstances, which may include suspected criminal activity, that reasonably gives rise to safety concerns as the justification for this type of warrantless search. Absent the ability of law enforcement to point to particular facts which support reasonable suspicion that persons involved in a specific investigatory stop may be armed and dangerous and thereby pose a safety threat, such a search, however limited, would violate the constitutional protection afforded by the Fourth Amendment to the United States Constitution and Article III, § 6 of the West Virginia Constitution. As the United States Supreme Court reiterated in *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), the Fourth Amendment's "touchstone is reasonableness, which is measured in objective terms by examining the totality of the circumstances." *Id.* at 34, 117 S.Ct. at 419.

■ Appellant next asserts that the State's evidence was insufficient to support his conviction because intent to deliver was not proven. Intent to deliver a controlled substance is a jury question, determined from all the surrounding facts and circumstances, which must be proven beyond a reasonable doubt. Syl. Pt. 3, *State v. Frisby*, 161 W.Va. 734, 245 S.E.2d 622 (1978), *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1043, 59 L.Ed.2d 87 (1979). We more specifically held in *State v. Drake*, 170 W.Va. 169, 291

---

**8.** Appellant does not challenge the propriety of the investigatory stop.

S.E.2d 484 (1982), that "intent to deliver a controlled substance can be proven by establishing a number of circumstances among which are the quantity of the controlled substance possessed and the presence of other paraphernalia customarily used in the packaging and delivery of controlled substances." *Id.* at 170, 291 S.E.2d at 485, syl. pt. 4, in part.

A review of the record reveals that evidence of the type and amount of the controlled substance was introduced at trial. Testimony was heard regarding the approximate street value of the cocaine which was confiscated, contrasted with the approximate cost of an individual purchase. Testimony also established the absence of paraphernalia normally associated with personal use of crack-cocaine. Other evidence introduced were items Appellant had on his person at the time of his arrest, including over $3,000 in cash and more than $335 in food stamps. Appellant's testimony at trial was that he had not worked for eight years and that he was not a food stamp recipient. Police testimony about the common practice of trading food stamps for cocaine was also heard. Accordingly, we conclude that there was ample evidence presented from which a jury could infer an intent to deliver the controlled substance.

For the reasons set forth herein, the judgment of the Circuit Court of Mercer County is affirmed.

Affirmed.