*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

# MEMORANDUM OPINION

No. 04-08-00257-CR

Stephen **HAMLIN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 290th Judicial District Court, Bexar County, Texas
Trial Court No. 2007-CR-0123
Honorable Sharon MacRae, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Catherine Stone, Chief Justice
    Karen Angelini, Justice
    Phylis J. Speedlin, Justice

Delivered and Filed:   April 1, 2009

AFFIRMED

Stephen Hamlin was charged with possession of methamphetamine. After the denial of his motion to suppress, he entered into a plea-bargain agreement and, in accordance with that agreement, was sentenced to twelve years imprisonment and a fine of $2,000. On appeal, he argues that the trial court should have granted his motion to suppress. We affirm.

## BACKGROUND

At the hearing on Hamlin's motion to suppress, four witness testified: Officer Marty Laurenz; Officer Louis Tijerina; Allen Harvison, a private investigator hired by Hamlin; and the defendant, Stephen Hamlin. At the end of the hearing, the trial court denied Hamlin's motion to suppress.

*Officer Marty Laurenz*

Officer Marty Laurenz testified that on the night of October 25, 2006, he and Officer Tijerina were on patrol when they saw a vehicle with a broken headlight. According to Officer Laurenz, after they stopped the vehicle, he dealt with the passenger, and Officer Tijerina dealt with the driver, Appellant Stephen Hamlin. When a computer check indicated that the passenger had an outstanding warrant relating to a traffic offense, Officer Laurenz arrested the passenger.

With respect the driver, Officer Laurenz testified that Officer Tijerina asked the driver, Hamlin, to get out of the vehicle and asked the driver whether he could search the vehicle. According to Officer Laurenz, Hamlin said, "Yes." As Officer Tijerina was searching the car, Officer Laurenz asked Hamlin whether Hamlin had anything on his person that Officer Laurenz "needed to know about." Hamlin replied "No." Officer Laurenz then asked if he could search Hamlin. Hamlin said "yeah, he didn't have a problem with it." According to Officer Laurenz, during his search of Hamlin, he found in Hamlin's pocket a small clear plastic baggie containing what appeared to be methamphetamine. So, Officer Laurenz placed Hamlin under arrest.

According to Officer Laurenz, Officer Tijerina then "finished the search and found more narcotics in [Hamlin's] sock." The officers then had an evidence technician come and field test the substance, and the substance tested positive for methamphetamine.

On cross-examination, when asked why he asked to search Hamlin, Officer Laurenz replied, "Because of the high crime area." Also on cross-examination, Officer Laurenz testified that the driver did not do anything that suggested a search was needed; he had a valid driver's license and proof of insurance; he did not show signs of intoxication; a computer check did not indicate any active warrants; and, a computer check did not indicate the car was stolen. Further, Officer Laurenz admitted that the passenger's and the driver's explanations of where they were going and their reason for being there were consistent. According to Officer Laurenz, neither did anything that caused him concern. Finally, Officer Laurenz testified that he was probably at the scene for at least forty-five minutes.

On re-direct, Officer Laurenz explained that running the computer check on the passenger and "get[ting] the identification and everything" took about ten to fifteen minutes. According to Officer Laurenz, during this period of time, the driver was still in the vehicle behind the steering wheel. Only after the passenger was "secured" did Officer Tijerina approach the driver and ask to search the vehicle, which Officer Laurenz estimated occurred about fifteen to twenty minutes after the initial stop. Then, because narcotics were found, they had to have an evidence technician come out to field test the suspected substance, which because the technicians "are tied up on other calls like burglaries" can take some time. So, Officer Laurenz estimated that the entire stop took forty-five minutes to an hour.

*Officer Louis Tijerina*

Like Officer Laurenz, Officer Louis Tijerina testified that they stopped the vehicle in question because of a broken headlight. According to Officer Tijerina, he approached the vehicle and asked the driver, Hamlin, for identification and proof of insurance. Officer Laurenz approached the

passenger. Then, they both went back to the patrol car to run computer checks. The check on the passenger indicated that he had an outstanding warrant. Officer Laurenz then took the passenger to the patrol car while Officer Tijerina remained with the driver and asked the driver for consent to search the vehicle. The driver, Hamlin, was still sitting in his vehicle. Hamlin consented to the search, and Officer Tijerina then asked him to step out of the vehicle. Officer Tijerina then searched the vehicle. Officer Tijerina testified that he searched the car only once. Officer Tijerina estimated that he started searching the vehicle about "three to five minutes" after the stop.

*Allen Harvison*

Allen Harvison, a private investigator hired by Hamlin, testified that he subpoenaed an audio recording, which also had a log, from the City of San Antonio. According to Harvison, the audio recording indicated that at 12:59 a.m., Officer Laurenz and Officer Hamlin were "attempting to make a traffic stop, and they say never mind, he's turning left."[1] According to Harvison, at 1:37 a.m., the audio recording indicated that they were at the scene of the traffic stop. At 1:55 a.m., the officers asked for a case number. At 2:03 a.m., they requested an evidence technician, who arrived at 2:41 a.m.

*Stephen Hamlin*

According to Hamlin, he was leaving the Wal-Mart and signaled to turn left. He was stopped by the police almost immediately after turning on to the highway. The officer informed him that he had been stopped for a broken headlight. The officer asked for his license and insurance. According

---

[1] At the end of the hearing, Hamlin's attorney argued that this testimony showed that Officers Laurenz and Tijerina initially stopped Hamlin at 12:59 a.m. In response, the State stated that "there was a record of 12:59 that was testified to by the defense witness." According to the State, "It sounded to me in the testimony like the officers were in the area of Austin Highway, and they were following someone, and they waved that person off because [he] made a turn." The trial court replied, "That's what I remember."

to Hamlin, when the officer came back, his attitude had completely changed, and he started asking Hamlin about his prior arrests for possession of methamphetamine. The officer asked for consent to search the vehicle, and Hamlin gave consent. According to Hamlin, the officer searched the car "at least three to four times, and there were other units that stopped and searched it as well." Hamlin was then asked by the other officer for consent to search his person. Hamlin testified that only after being "intimidated" for about fifteen minutes did he consent to the search of his person.

Further, according to Hamlin, he was asked to give consent to search his person about thirty-five to forty minutes after the initial stop. Hamlin also testified that after the initial stop, "it was well over an hour-and-a-half before [the officers] got a case number." And, Hamlin estimated that the entire stop lasted two to two-and-a-half hours.

### MOTION TO SUPPRESS

Hamlin does not contest the initial stop of his vehicle; he admits that his headlight was broken. Instead, Hamlin argues that the trial court erred in not granting his motion to suppress because his detention was unconstitutionally prolonged.

In a motion to suppress, we "view the record in the light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement." *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). "We give almost total deference to a trial court's express or implied determination of historical facts and review de novo the court's application of the law of search and seizure to those facts." *Id.*

Hamlin argues that once Officer Tijerina obtained his driver's license and proof of insurance, and then ran a computer check that did not result in any outstanding warrants, Officer Tijerina's investigation into the traffic violation was over, and Hamlin should have been allowed to leave.

Thus, Hamlin argues he was illegally detained because the officer was conducting a "fishing expedition" in violation of the Fourth Amendment to the Constitution.

While it is true that once the purpose of a traffic stop has been satisfied, the stop may not be used as a fishing expedition to discover unrelated criminal activity and that any continued detention must be supported by additional reasonable suspicion, *Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997), in this case, Hamlin gave consent to search his vehicle and person. Reviewing the record in the light most favorable to the trial court's ruling, we note that Officer Tijerina testified that immediately after conducting the computer check, he asked for and was granted consent to search the vehicle. Officer Laurenz testified that while Officer Tijerina was conducting the vehicle search, he asked and was granted consent to search Hamlin's person. "Merely requesting such consent does not amount to an unlawful seizure, and neither probable cause nor reasonable suspicion is required for the officer to ask." *Guerrero v. State*, No. 04-04-00684-CR, 2005 WL 2438315, at *2 (Tex. App.—San Antonio 2005, no pet.) (not designated for publication); *see also James v. State*, 102 S.W.3d 162, 173 (Tex. App.—Fort Worth 2003, pet. ref'd). "Nor does the encounter become a further detention simply due to the request for permission to search." *Guerrero*, 2005 WL 2438315, at *2. Thus, we hold that Hamlin was not illegally detained. *See id.* (holding that because defendant gave consent to search, defendant was not illegally detained even though officer had already given defendant a verbal warning for traffic violation).

## CONSENT TO SEARCH PERSON

Hamlin also argues that (1) the State failed to show by clear and convincing evidence that Hamlin's consent to search his person was voluntary, and (2) even if his consent was voluntary, the search of his person exceeded the scope of his consent.[2]

Voluntariness is a question of fact to be determined from the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 40 (1996). If voluntariness is challenged in the trial court, the State under the United States Constitution must prove voluntariness of consent by a preponderance of the evidence. *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000). Under the Texas Constitution, the State must prove voluntariness by clear and convincing evidence. *Id.* Further, when, as here, a trial court does not enter findings of fact when denying a motion to suppress, we must "view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record." *Harrison v. State*, 205 S.W.3d 549, 552 (Tex. Crim. App. 2006). And, we afford almost total deference to the trial court's rulings on credibility questions. *Id.*

Officer Laurenz testified that while Officer Tijerina searched Hamlin's car, he asked Hamlin to come to the back of the car with him. Officer Laurenz then asked Hamlin if he had anything on his person that Officer Laurenz needed to know about. According to Officer Laurenz, Hamlin responded, "No." Officer Laurenz then asked Hamlin if he could search Hamlin's person. Officer Laurenz testified, "He said, yeah, he didn't have a problem with it. So, then I started to search him, and I found a small clear plastic baggie" of what appeared to be methamphetamine in Hamlin's right

---

[2] We note that the State argues that Hamlin has waived this second issue. However, we need not address waiver as we are upholding the trial court's credibility determination regarding whether the search exceeded the scope of Hamlin's consent.

front jeans pocket. On cross-examination, when asked if he did a pat-down search, Officer Laurenz replied, "I asked him if he had anything on him that I needed to know about, at which time he said, no. I then asked if I could search, and he said, yes." Officer Laurenz then confirmed that he never does a pat-down search without first asking for consent.

In contrast, Hamlin testified that at first, he did not give consent to search his person. According to Hamlin, Officer Laurenz told him to put his hands against the car so that he could search Hamlin. Hamlin testified that after fifteen minutes of Officer Laurenz "intimidat[ing]" him and of him repeatedly telling the officer "no," Hamlin finally "[p]ut my hands against the car and let him search me." And, according to Hamlin, when Officer Laurenz conducted the search, "he turned pockets inside out and took everything out of [his] pockets."

Hamlin also emphasizes that although officers have written consent forms, Hamlin was not asked to sign a written consent form. However, Officer Laurenz testified that they did not use the forms on the night in question because they did not have the forms with them on that particular night.

In reviewing the evidence under our standard of review, we find no error on the part of the trial court. Whether Hamlin nonchalantly gave consent, as testified to by Officer Laurenz, or whether he was intimidated into giving consent, as testified to by Hamlin, is a credibility question. Likewise, whether Hamlin was not asked to sign a written consent form because he, in fact, never gave consent, or whether he was not asked to sign a written consent form because none were available on the night in question is also a credibility question. Similarly, whether Hamlin consented only to a pat-down search and whether Officer Laurenz exceeded the scope of that consent by pulling out his pockets is a credibility question. The trial court observed the demeanor of the witnesses and judged their credibility. We must defer to the trial court's determination of such credibility questions.

## CONCLUSION

We affirm the judgment of the trial court.


Karen Angelini, Justice

DO NOT PUBLISH