NOS. 12-99-00463-CR


 12-99-00464-CR



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


RODRIGO ATEMPA,
§
 APPEAL FROM THE EIGHTH

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF


THE STATE OF TEXAS,

APPELLEE
§
 HOPKINS COUNTY, TEXAS

 

 Appellant Rodrigo Atempa pleaded not guilty to two separate indictments charging him with
possession of more than four hundred grams of cocaine and more than four hundred grams of heroin.
A jury found him guilty and assessed his punishment at fifty years of imprisonment in each cause. 
Appellant raises six issues for our consideration. We affirm. 


Background (1)

 On April 19, 1999, Texas Department of Public Safety ("D.P.S.") Trooper Todd Brackhahn
("Brackhahn") was working traffic on Interstate Highway 30, west of Sulphur Springs. Shortly after
noon, Brackhahn, who was westbound, noticed an eastbound vehicle traveling above the posted
speed limit of seventy miles per hour. Brackhahn checked the car's speed with his radar equipment
to confirm that the car was exceeding the speed limit. He turned his patrol car around and stopped
the vehicle, a 1986 Mercury Grand Marquis with Illinois license plates and registration.

 Brackhahn approached the vehicle on the passenger side. Appellant, who was alone in the
vehicle, produced an Illinois driver's license which identified him as Rodrigo Atempa of Waukegan,
Illinois, date of birth March 13, 1966. Appellant informed the trooper that the car belonged to him. (2) 

 Brackhahn had noticed immediately that the windshield of Appellant's vehicle was new. The
windshield was not scratched or pitted, and the trooper could smell some type of sealant around the
windshield. Brackhahn asked Appellant if he had recently made any repairs to the vehicle. When
Appellant hesitated in answering the question, the trooper asked the question a different way, saying
"reparo," which he testified he believed was the Spanish word for "repair." Appellant told the
trooper that the muffler had been repaired or needed to be repaired, (3) but did not mention the
windshield. At that point, Brackhahn became suspicious that Appellant might be secreting
contraband in his car. 

 The trooper testified that certain year-model Ford and Mercury vehicles have a hollow
firewall compartment under the windshield where narcotics traffickers have been known to hide
contraband in that hollow compartment. Brackhahn testified that to access the compartment, one
must remove the windshield and cut open the firewall. After filling the hollow space with drugs, the
traffickers typically replace the top of the firewall and repair it with Bond-O, repaint the section, and
replace the windshield.

 Brackhahn asked Appellant to step to the rear of his vehicle, explaining that he was going
to issue him a warning ticket for speeding. Based on his developing suspicions, the trooper further
questioned Appellant as he was writing the warning ticket. Appellant related that he was traveling
from Mexico to Illinois, that he had been to Mexico for his father's funeral, that his wife and child
were back home in Waukegan, and that he was a "taxi" driver. Appellant said he had crossed the
border at Laredo at eight or nine o'clock the previous night.

 Brackhahn testified that at that point, his suspicions had been fully aroused. The trooper
based his suspicions on several factors: (1) the trooper had seen narcotics smugglers secrete
contraband in the firewall area of a Mercury Grand Marquis, (2) to access the firewall area of a
Mercury Grand Marquis, the windshield must be removed, (3) the trooper could smell fresh sealant
around the windshield, (4) Appellant did not mention that his windshield had been replaced when
asked about repairs, (5) Appellant had been traveling overnight-when police presence is lowest, (6)
Appellant was traveling from a known drug source area to a known drug distribution area and from
west to east, as illegal narcotics flow, (7) Appellant claimed to have been to a family funeral but his
wife and child were not with him, (8) the trooper had often seen narcotics smugglers secrete
contraband in the gas tank which is directly above the muffler in a Mercury Grand Marquis, and (9)
Appellant mentioned that the muffler had been repaired or needed to be repaired.

 About five minutes into the traffic stop, Brackhahn completed the warning ticket and asked
Appellant to sign it. As Appellant was signing the ticket, Brackhahn asked Appellant, in Spanish,
if he had any weapons in the vehicle. Appellant replied that he did not. Brackhahn asked if he could
look, and Appellant consented, gesturing toward the vehicle. The trooper asked Appellant if he had
any cocaine or marihuana in the car, and Appellant again responded in the negative and gestured
toward the vehicle as he consented to Brackhahn's request to look.

 Upon closer examination, Brackhahn discovered that the windshield sealant was tacky and
noticed that the windshield stickers were original Illinois stickers. Brackhahn asked Appellant if the
windshield had been replaced, and Appellant replied that it had been replaced in Mexico the week
before the stop. 

 Brackhahn radioed for a drug-sniffing canine to come to the location. Then Brackhahn asked
Appellant why he had not mentioned that the windshield had been replaced when the trooper asked
him about repairs to the vehicle. Appellant said he had not understood the question. Brackhahn
questioned Appellant about where and when the windshield had been replaced, and Appellant told
the trooper that the windshield had been replaced in a Mexican junkyard at a cost of about thirty-five
dollars.

 Next, Brackhahn asked Appellant how long he had been in Mexico, and after looking at a
calendar, Appellant responded that he had been there about three weeks. At that point, Brackhahn
radioed for information regarding Appellant's recent border crossings. 

 Brackhahn indicated that he was going to continue searching the car, and Appellant
responded, "I don't have no problem. You can check everything you want." Before he began
searching the car again, Brackhahn asked Appellant, in Spanish, how to say "to fix, to repair," and
Appellant told him, "reparar." 

 Brackhahn continued to search Appellant's vehicle, but did not investigate the windshield
and firewall area for some time. The trooper testified that he thought he would be able to see into
the firewall area of Appellant's car from under the dashboard, but that until another police officer
arrived, he believed it would have been unsafe to lie on his back in the floorboard, with his head
under the dash. Shortly, an off-duty D.P.S. corporal arrived at the location. 

 About fifteen minutes after Brackhahn had requested the drug dog be sent to his location, the
dispatcher advised him that the dog was unavailable. The trooper requested that another canine unit
be sent. 

 Brackhahn informed Appellant that he could see that certain modifications had been made
to Appellant's car and that he wanted to take a closer look. The trooper asked Appellant if he would
drive his car to the D.P.S. office where he had better tools with which to search the car. Appellant
declined to move the car, but agreed that the trooper could continue his search at the current location. 
At that point, the trooper retrieved a cordless drill from his patrol car to facilitate his search. 
Brackhahn testified that when Appellant saw the drill, he became perceptibly nervous, with sweat
visible on his forehead and upper lip. 

 Upon recommencing the search, Brackhahn found a dashboard screw in the backseat of
Appellant's car. When he looked under the dashboard, the trooper discovered a silicone or tar-like
sealant in an opening into the firewall which should have been covered by a flat, cogged cap. When
Brackhahn pulled the sealant out of the opening, he could see brown packaging tape of the sort
frequently used by narcotics traffickers to bundle illegal drugs. The trooper punctured the taped
bundle with an ice pick and pulled out a brown, powdery substance. The trooper could smell a
strong vinegar odor, and he smelled an ether odor which he knew to be indicative of the presence
of cocaine. At that point, Brackhahn asked the off-duty corporal to place Appellant under arrest.

 About forty minutes into the traffic stop, and almost thirty minutes after Brackhahn had first
requested a drug dog, Cleve Williams, an officer with the Sulphur Springs Police Department,
arrived at the location with his certified drug-sniffing canine. Though the dog showed some signs
of interest in Appellant's car, he did not give his handler a final response indicating the presence of
narcotics. Officer Williams testified that, on reflection, he believed that the dog did not find the
narcotics at that time because the doors and windows of the vehicle had been open for some time,
and the wind was blowing hard so that the odor of the contraband could not build up in the car.

 Brackhahn Mirandized Appellant and had Appellant's car towed to the D.P.S. office where
Officer Williams once again ran his dog on it. At that time, the dog gave a final response indicating
the presence of narcotics at the dashboard area of the car. 

 Brackhahn and another officer kicked the windshield out of Appellant's car and broke into
the firewall compartment with crowbars. Inside the firewall compartment, Brackhahn found four
packages of cocaine and two packages of heroin. No useable fingerprints were found on the
windshield or the firewall compartment or on the bundled drugs.

 No other contraband was found in the vehicle, but Brackhahn seized various papers from
Appellant's car, including a receipt for a Greyhound bus ticket for travel on April 1, 1999, from
Nuevo Laredo to Monterrey, Mexico via Laredo, Texas. Also, Brackhahn found some vehicle
registration and insurance papers in the name of Rodrigo Atempa written in Spanish, an entrance visa
into Mexico dated July 15, 1998, and a receipt for a Western Union wire transfer of 6160 pesos from
the United States to Mexico in the name of Rodrigo Atempa, dated April 8, 1999. Also, the trooper
recovered some religious pamphlets and icons from the vehicle which he testified were often used
by narcotics traffickers as good luck charms or to create false impressions.

 The D.P.S. chemist who tested the drugs recovered from Appellant's car testified that the
cocaine weighed 4.67 kilograms and was seventy-five percent pure. The chemist testified that the
heroin recovered from Appellant's vehicle weighed 1.36 kilograms and was sixty-five percent pure. 
 A D.P.S. Narcotics Service supervisor testified about the usual process of distribution of
illegal drugs and the resulting dilution of purity of the drugs in the narcotics trade. He testified that
based on the street price for user amounts of the two drugs, the value of the cocaine recovered from
Appellant's car was $747,200, and the value of the heroin recovered from Appellant's car was
$2,720,000. 

 A United States Customs Service Special Agent testified that a Rodrigo Atempa, date of birth
March 13, 1966, entered the United States from Mexico by plane four times between July of 1998
and December of 1998 and once in March of 1999 on a bus or in a taxi. Also, the agent testified that
the Mercury automobile had crossed into the United States from Mexico two times, once in
December of 1998, and once the night before Appellant was stopped in Hopkins County. 

 Appellant testified in his own behalf, confirming that the 1986 Mercury Grand Marquis
belonged to him. Appellant told how three men whom he had met in Mexico had borrowed his car
and returned it with a broken windshield. Appellant said the men had the windshield replaced at a
Mexican junkyard two to three weeks before his father died. (4) Appellant testified that he believed
the three men must have planted the drugs in his car, intending to retrieve them when they came to
Waukegan.

Motion to Suppress


 In his first and second issues, Appellant contends that the trial court erred by refusing to
suppress the drug evidence because it was obtained in violation of his rights under the Fourth and
Fourteenth Amendments to the Constitution of the United States. (5) Specifically, Appellant argues
(1) that he was detained without reasonable suspicion once the trooper had completed his
investigation of the initial traffic stop and, therefore, that his consent to search his vehicle was not
freely and voluntarily given; and (2) that the trooper's search of his car exceeded the scope of any
consent requested by the officer. We disagree. 

 In a suppression hearing, the trial court is the sole trier of fact and the judge of the credibility
of witnesses and the weight to be given their testimony. State v. Ballard, 987 S.W.2d 889, 891 (Tex.
Crim. App. 1999). We afford almost total deference to a trial court's determination of the historical
facts that the record supports especially when the trial court's fact findings are based on an evaluation
of credibility and demeanor. Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We
afford the same amount of deference to trial courts' rulings on "application of law to fact questions,"
also known as "mixed questions of law and fact," if the resolution of those ultimate questions turns
on an evaluation of credibility and demeanor. Id. We review de novo questions of law based on
undisputed facts. Oles v. State, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999). For example, we
review de novo determinations of reasonable suspicion and probable cause when the facts are
undisputed. Guzman v. State, 955 S.W.2d at 87. It follows that where, as in the instant case, the
facts surrounding consent to search are undisputed, we review de novo voluntariness of consent. We
must view the record in the light most favorable to the trial court's ruling and sustain the trial court's
ruling if it is reasonably correct on any theory of law applicable to the case. Id. at 89. Where, as
here, a trial court makes no explicit findings of historical fact, we presume it made findings
necessary to support its ruling as long as those implied findings are supported by the record. 
Carmouche v. State, 10 S.W.3d 323, 327-28 (Tex. Crim. App. 2000).

 Appellant does not dispute that the initial traffic stop was legal and reasonable, but avers that
his continued detention after the trooper issued him a warning ticket was unlawful. A routine traffic
stop is a detention and thus, must be reasonable under the United States and Texas Constitutions. 
Simpson v. State, 29 S.W.3d 324, 327 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd). Under the
Fourth and Fourteenth Amendments, a search conducted without a warrant issued upon probable
cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated
exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043, 36 L. Ed. 2d 854
(1973).

 One such well-established exception is a temporary detention based on reasonable suspicion
supported by articulable facts that criminal activity may be afoot. See Woods v. State, 956 S.W.2d
33, 35 (Tex. Crim. App. 1997) (citing Terry v. Ohio, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884-85, 20 L.
Ed. 2d 889 (1968)). To establish reasonable suspicion, an officer must be able to articulate
something more than an inchoate and unparticularized suspicion or hunch. See United States v.
Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 (1989). The determination of
reasonable suspicion must be based on common sense judgments and inferences about human
behavior. See Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570
(2000). In other words, a temporary investigative detention is reasonable if it is based on articulable
facts which, taken together with rational inferences from those facts, would warrant a man of
reasonable caution in the belief that a continued detention was justified, i.e., that the detainee was
or would soon be engaged in criminal activity. See Simpson, 29 S.W.3d at 327.

 Brackhahn was able to articulate several facts that caused him to suspect Appellant was
engaging in criminal activity. Brackhahn testified that his suspicions were based on several factors: 
(1) the trooper had seen narcotics smugglers secrete contraband in the firewall area of a Mercury
Grand Marquis; (2) to access the firewall area of a Mercury Grand Marquis, the windshield must be
removed; (3) the trooper could smell fresh sealant around the windshield; (4) Appellant did not
mention that his windshield had been replaced when asked about repairs to the vehicle; (5) Appellant
had been traveling overnight when police presence on the highways is lowest; (6) Appellant was
traveling from a known drug source area, Mexico, to a known drug distribution area, Chicago,
Illinois, and from west to east as illegal narcotics flow; (7) Appellant claimed to have been to a
family funeral but his wife and child were not with him; (8) the trooper had seen narcotics smugglers
secrete contraband in the gas tank which is directly above the muffler in a Mercury Grand Marquis;
and (9) Appellant mentioned that the muffler had been repaired or needed to be repaired. Based
upon our de novo review, we hold that Brackhahn had reasonable suspicion based on articulable
facts sufficient to continue to detain Appellant after the traffic stop. 

 Even if we had found that Brackhahn did not have reasonable suspicion to continue to detain
Appellant, we would still uphold the trial court's ruling based on the well-established "voluntary
consent" exception to the constitutional prohibition against unreasonable searches and seizures. In
the Simpson case, the Fourteenth Court of Appeals addressed the issue of voluntary consent in the
absence of reasonable suspicion to detain under the holding of the Texas Court of Criminal Appeals
in Davis v. State, 947 S.W.2d 240 (Tex. Crim. App. 1997). The Houston Court wrote:


 In Robinette, the U.S. Supreme Court held that a continued detention and request to search a
detainee's car following a traffic stop was reasonable, where consent was given, even though no
circumstances were noted that would have constituted reasonable suspicion of any criminal activity.
(citation omitted.) By contrast, in Davis, the Court of Criminal Appeals found the officers' conduct
unreasonable where, after the detainee refused to consent to a search of his car, the officers
nevertheless detained the vehicle and thus its occupants who had no other means to depart. (citation
omitted.) We interpret Davis and Robinette to mean that an officer may request consent to search a
vehicle after a traffic stop but may not detain the occupants or vehicle further if such consent is refused
unless reasonable suspicion of some criminal activity exists. 


Simpson, 29 S.W.3d at 328. We adopt the reasoning of the Houston court in its entirety. We hold
that Brackhahn could ask for Appellant's voluntary consent to search his vehicle after conclusion
of the traffic stop even without reasonable suspicion that criminal activity was afoot.

 For Appellant's consent to be effective, of course, it must have been freely and voluntarily
given. "The Fourth Amendment test for a valid consent to search is that the consent be voluntary,
and voluntariness is a question of fact to be determined from all the circumstances." Ohio v.
Robinette, 519 U.S. 33, 40, 117 S. Ct. 417, 421, 136 L. Ed. 2d 347 (1996). In order to be valid, the
consent must "not be coerced, by explicit or implicit means, by implied threat or covert force."
Schneckloth, 412 U.S. at 228, 93 S. Ct. at 2048; Carmouche, 10 S.W.3d at 331.

 Although the federal constitution only requires the State to prove the voluntariness of consent
by a preponderance of the evidence, the Texas Constitution requires the State to show by clear and
convincing evidence that the consent was freely given. Carmouche, 10 S.W.3d at 331. If the record
supports a finding by clear and convincing evidence that consent to search was free and voluntary,
we will not disturb that finding. Id. 

 "The standard for measuring the scope of a suspect's consent under the Fourth Amendment
is that of objective reasonableness--what would the typical reasonable person have understood by
the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251, 111 S.
Ct. 1801, 1803-04, 114 L. Ed. 2d 297 (1991). The scope of a search is also defined by its expressed
object, and a suspect is free to delimit the scope of the search to which he consents. See id. Unless
an officer's request, or a suspect's consent, limits a search to a particular area of the vehicle, such as
the passenger compartment or trunk, a request for a search "of the car" reasonably includes all areas
of the vehicle and excludes none. Simpson, 29 S.W.3d at 330. In addition, when an officer has
asked a suspect whether he has any weapons, drugs, or contraband in the vehicle immediately before
asking to search the vehicle, the object of the search would be construed by a reasonable person as
encompassing any area of the car in which such objects could be concealed. See id. 

 Our de novo review of Brackhahn's testimony and the videotape demonstrate that Appellant
clearly and unequivocally, freely and voluntarily consented to the search of his vehicle. We hold that
the scope of the search did not exceed the scope of Appellant's consent. When the trooper
specifically asked if he could search Appellant's car for any weapons or illegal drugs, Appellant
consented and even gestured toward the car with a sweeping motion of his arms. When Brackhahn
was about to resume searching the vehicle after asking Appellant some questions, Appellant said,
"I don't have no problem. You can check everything you want." When the trooper informed
Appellant that he believed Appellant's car had been modified and he wanted to look more closely
at the modifications, Appellant again assented. 

 We hold that the trial court did not err by overruling Appellant's motion to suppress the drug
evidence. Accordingly, we overrule Appellant's first and second issues.


Sufficiency of the Evidence

 In his third and fourth issues, Appellant contends that the evidence is legally insufficient to
support his convictions specifically because there is no evidence that he knowingly possessed the
illegal narcotics. 

 The standard of review for legal sufficiency of the evidence is whether, viewing the evidence
in the light most favorable to the jury's verdict, any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); Whitaker v. State, 977 S.W.2d 595, 598 (Tex.
Crim. App. 1998). An appellate court should uphold the jury's verdict "unless it is found to be
irrational or unsupported by more than a mere modicum of evidence." Moreno v. State, 755 S.W.2d
866, 867 (Tex. Crim. App. 1988). All conflicts in the evidence should be resolved in favor of the
verdict, and every reasonable inference indulged. Sneed v. State, 803 S.W.2d 833, 837 (Tex. App.-
Dallas 1991, pet. ref'd). The jury is the exclusive judge of the credibility of the witnesses and of the
weight to be given their testimony. Barnes v. State, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994). 
Likewise, reconciliation of conflicts in the evidence is within the exclusive province of the jury. 
Losada v. State, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986).

 To establish the unlawful possession of a controlled substance, the State must prove that the
defendant (1) exercised care, custody, control, or management over the contraband, and (2) knew
what he possessed was contraband. Tex. Health & Safety Code Ann. §§ 481.002(38), 481.115
(Vernon Supp. 2001); Brown v. State, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995). Both cocaine
and heroin are controlled substances. Tex. Health & Safety Code Ann. §§ 481.102 (2), 481.102
(3)(D) (Vernon Supp. 2001).

 Appellant does not dispute that he had care, custody, and control of the illegal narcotics. 
Appellant cites a lack of direct proof that he knowingly possessed the drugs. Proof of a culpable
mental state generally exists in circumstantial evidence. Dunn v. State, 13 S.W.3d 95, 98 (Tex.
App.- Texarkana 2000, no pet.); Ortiz v. State, 930 S.W.2d 849, 852 (Tex. App.- Tyler 1996, no
pet.). Thus, proof of knowledge is an inference drawn by the trier of fact from all the circumstances.
Id. A jury can infer knowledge or intent from the acts, conduct, and remarks of the accused and
from the surrounding circumstances. Nazemi v. State, 28 S.W.3d 806, 810 (Tex. App.-Corpus
Christi 2000, no pet.); Ortiz, 930 S.W.2d at 852.

 Knowledge of the presence of contraband may be inferred from control over the vehicle in
which the contraband is concealed. Menchaca v. State, 901 S.W.2d 640, 652 (Tex. App.- El Paso
1995, pet ref'd.); Castellano v. State, 810 S.W.2d 800, 806 (Tex. App.- Austin 1991, no pet.). 
Courts have cautioned, however, that when the contraband is found in a hidden compartment in a
vehicle, reliance should not be placed solely upon control of the vehicle to show knowledge. Id. 
Thus, we must look to additional factors indicating knowledge of the presence of the illegal
narcotics. 

 The courts have considered a number of factors to be "affirmative links," i.e., facts and
circumstances in addition to mere presence that raise a reasonable inference of the accused's
knowledge and control of the contraband, including whether the defendant was present when the
search was executed; whether the contraband was in plain view; whether the contraband was close
and accessible to the defendant; whether the defendant was under the influence of a controlled
substance at the time of his arrest; whether the defendant possessed other contraband when arrested;
whether the defendant made incriminating statements when arrested; whether the defendant
attempted to flee; whether the defendant made furtive gestures; whether the odor of the contraband
was present; whether the contraband or drug paraphernalia was present; whether the defendant
owned or had a right to possess the place where the drugs were found; and whether the drugs were
discovered in an enclosed space. See, e.g., Green v. State, 892 S.W.2d 220, 222 (Tex. App.-
Texarkana 1995, pet. ref'd). The courts have continued to expand the list of factors considered to
be affirmative links, often stressing that the number of factors presented is less important than the
totality of the circumstances linking the defendant to the contraband. Bethancourt-Rosales v. State,
50 S.W.3d 650, 654 (Tex. App.-Waco 2001, pet. filed). For example, where the amount of
contraband is large enough to indicate that the accused knew of its presence, the courts have held
such to be an affirmative link. Menchaca, 901 S.W.2d at 652; Castellano, 810 S.W.2d at 806. 
Also, where the defendant offers an implausible story to explain his actions, the courts have found
an affirmative link. Bethancourt-Rosales, 50 S.W.3d at 654. Additionally, several courts have
upheld convictions based in part on the testimony of officers familiar with the value of drugs and
common patterns of drug transportation. Id. at 655.

 In the instant case, many factors indicated Appellant knew of the presence of the contraband,
or "linked" Appellant to the contraband: (1) Appellant owned the car carrying the drugs and was the
sole occupant of it; (2) the illegal drugs were found in an enclosed space; (3) there was a large
amount of contraband; (4) Appellant had traveled through the night when police presence on the
highways is lowest; (6) Appellant was traveling from a known drug source area to a known
distribution area; (7) Appellant had crossed into the United States from Mexico several times by
different modes of transportation in the recent past; (8) Appellant was carrying with him several
religious icons commonly carried by narcotics traffickers.

 Another factor indicative of Appellant's knowledge of the illegal narcotics was the value of
the contraband. The D.P.S. narcotics officer testified that the cocaine and heroin in Appellant's car
were together worth about $3.5 million. It is a reasonable inference that Appellant would not have
been taking such valuable cargo across an international border if he were a mere innocent, ignorant
of all the details surrounding his responsibility and the importance of the cargo in his care. See
Castellano, 810 S.W.2d at 806 (finding similar inference rational).

 Perhaps the most compelling factor linking Appellant to the contraband was his implausible
explanation about the new windshield. Appellant's story about meeting three men in Mexico, letting
them borrow his car, and then letting them take his car again to have the windshield replaced after
they had broken it, is simply not plausible. Furthermore, Appellant's testimony about when the
windshield was replaced was contradictory to his roadside explanation. On the date of the offense,
Appellant told Brackhahn that the three men had the windshield replaced the week before the traffic
stop. On the stand, Appellant told the jury that the three men had the windshield replaced two or
three weeks before his father died; Appellant himself put on evidence that his father had died some
seven weeks before the traffic stop. Neither explanation was consistent with the windshield sealant
still being tacky, and Appellant never gave a plausible explanation for the original Illinois
registration stickers on a windshield purportedly bought in a Mexican junkyard. Finally, Appellant's
contention that he did not originally tell the trooper that the windshield had been replaced because
he did not understand the trooper's question is suspect where Appellant was able to translate "to fix,
to repair" for the trooper when asked later. 

 Viewing the evidence in the light most favorable to the verdict, we hold that a rational trier
of fact could have found beyond a reasonable doubt that Appellant knowingly committed the charged 
offenses. We hold that there was legally sufficient evidence to support the jury's verdicts. 
Therefore, Appellant's third and fourth issues are overruled.


The State's Motion in Limine

 In his fifth and sixth issues, Appellant contends that the trial court abused its discretion by
excluding evidence of a post-arrest search of Appellant's Illinois home. We hold that error, if any,
is not preserved.

 The trial court granted the State's motion in limine regarding a search of Appellant's home
in Waukegan by the Illinois State Police. During the testimony of Appellant's brother-in-law,
defense counsel approached the bench and stated, "At this time I'd like to go into issues involving
the search of the home in Waukegan." The judge responded, "That's denied." Counsel made no
offer of proof at that time.

 Error may not be predicated upon a ruling which excludes evidence unless a substantial right
of a party is affected and the substance of the evidence was made known to the court by offer of
proof or was apparent from the context within which questions were asked. Warner v. State, 969
S.W.2d 1, 2 (Tex. Crim. App. 1998); Tex. R. Evid. 103(a). A ruling on a motion in limine is not
alone sufficient to preserve error for appellate review. Hatchett v. State, 930 S.W.2d 844, 849 (Tex.
App.- Houston [14th Dist.] 1996, pet. ref'd). Because a ruling on a State's motion in limine that
excludes defense evidence is subject to reconsideration throughout trial, to preserve error, an offer
of the evidence must be made at the very time when the subject is raised during the trial. Warner,
969 S.W.2d at 2. As no offer of proof was made at the time when Appellant desired to put on
evidence about the Illinois search, Appellant has failed to preserve error. Therefore, Appellant's fifth
and sixth issues are overruled. 

 The judgments of the trial court are affirmed. 



 LEONARD DAVIS 

 Chief Justice



Opinion delivered November 14, 2001.

Panel consisted of Davis, C.J., Worthen, J., and Griffith, J.








 




















(DO NOT PUBLISH)
1. This recitation is compiled from testimony at a suppression hearing, trial testimony, and a videotape of the
traffic stop. 
2. Throughout the stop, the trooper and Appellant conversed in both English and Spanish. 
3. The trooper could not recall specifically what Appellant said, and Appellant's response on the videotape is
inaudible. 
4. A Mexican death certificate listed the date of Appellant's father's death as February 25, 1999. 
5. Appellant's first issue goes to suppression of the heroin evidence, and Appellant's second issue goes to
suppression of the cocaine evidence. The issues are otherwise identical and are briefed together. Throughout his
brief, Appellant follows this pattern of enumerating his issues separately as pertaining to the heroin case or to the
cocaine case, but consolidating his arguments and authorities.