IN THE MATTER OF MARRIAGE OF YOUNG



NO. 07-01-0272-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



FEBRUARY 12, 2002



______________________________




IN THE MATTER OF THE MARRIAGE OF


JERRY V. YOUNG AND PEGGY JOYCE YOUNG



_________________________________



FROM THE 64TH DISTRICT COURT OF HALE COUNTY;



NO. A28736-9607; HONORABLE JACK R. MILLER, JUDGE



_______________________________



Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

 In three points of asserted error, appellant Jerry V. Young (Jerry) challenges the trial
court's division of assets and allocation of liabilities between him and appellee Peggy
Joyce Young (Peggy). For reasons we later recount, we affirm in part, and reverse and
remand in part.

 The parties were married in 1981. Although both of them had children from prior
marriages, no children were born to this marriage. In July 1996, Jerry filed his petition
asking that the marriage be dissolved because of a discord or conflict of personalities and
that Peggy was guilty of cruel treatment. Peggy's answer included a counterclaim seeking
a divorce on the same grounds asserted by Jerry, except that he was the one allegedly
guilty of cruel treatment. In October 1996, Jerry's mother, Edna Young (Edna) intervened
in the suit asserting that she had loaned the parties $242,939 and that they owed her
$24,000 rent. Edna alleged that she had made a series of 12 loans from January 1985,
through December 1994. In November 1996, the trial judge signed agreed temporary
orders requiring both parties to file inventories and requiring Jerry to pay specified monthly
expenses of Peggy totaling $2,788.35. In October 1998, Peggy alleged that Jerry had
failed to make the monthly payments and sought enforcement of the temporary support
order. On December 8, 1998, the case was tried to the bench and, on October 15, 1999,
a judgment was signed dissolving the marriage and dividing the property.

 On December 28, 1999, the trial court granted a partial new trial limited to the issues
concerning the proper division of the assets and liabilities between the parties, based on
the record before the court at the conclusion of the trial which commenced on December
8, 1998. On April 4, 2001, the court handed down its amended divorce decree containing
the property division giving rise to this appeal. Included in the property division was a
recitation that the court had rendered judgment on October 15, 1999, in favor of Edna in
the amount of $219,500, which was to be paid by Jerry. In response to Jerry's request, the
trial court entered findings of fact and conclusions of law. Jerry now presents three points
error. In those points, he asserts 1) the division of assets and liabilities is manifestly unjust,
2) the decree improperly divests appellant of his separate property, and 3) there is legally
and factually insufficient evidence supporting a money judgment in favor of Peggy for
unpaid temporary support.

 As we noted, in his first point, Jerry challenges the trial court's division of the
community assets and liabilities. Peggy initially responds that Jerry failed to preserve any
error in this regard because Jerry, "while acknowledging that many circumstances may
provide a basis for justifying a court's division of a marital estate, failed to attack most of
the factors found (in the findings of fact) as justification for the disproportionate division at
issue." However, because Jerry specifically addressed the disproportionate division of the
community estate in his motion for new trial, Peggy's waiver argument is without merit. In
a divorce proceeding, a trial court is required to order a division of the parties' estate in a
manner it deems just and right. See Tex. Fam. Code Ann. § 7.001 (Vernon 1998). The
ultimate and controlling issue as to the property division is whether it is just and right. Hill
v. Hill, 971 S.W.2d 153, 155 (Tex.App.--Amarillo 1998, no pet.). The ultimate or controlling
issue as to the property division is whether it is just and right and the values of the property
being divided, though related to the ultimate issue, is not a controlling issue. Hill v. Hill,
971 S.W.2d 153, 155 (Tex.App.--Amarillo 1998, no pet.); Rafferty v. Finstad, 903 S.W.2d
374, 376 (Tex.App.--Houston [1st Dist.] 1995, writ denied).

 The trial court is afforded wide discretion in dividing the marital estate and its
discretion will not be disturbed on appeal unless a clear abuse of discretion is shown. 
Jacobs v. Jacobs, 687 S.W.2d 731, 733 (Tex. 1985); Murff v. Murff, 615 S.W.2d 696, 698
(Tex. 1981). The community property need not be equally apportioned between the
parties. See id. 698-99. In exercising its discretion, the trial court may consider many
factors. For example, the trial court may consider a spouse's dissipation of the community
estate, as well as the spouse's misuse of community property. Vannerson v. Vannerson,
857 S.W.2d 659, 669 (Tex.App--Houston [1st Dist.] 1993, writ denied); Reaney v. Reaney,
505 S.W.2d 338, 340 (Tex.Civ.App.--Dallas 1974, no writ). A disproportionate award may
also be considered when a spouse conceals community assets. Rafdi v. Rafdi, 718
S.W.2d 43, 45 (Tex.App.--Dallas 1988, no writ). A spouse's failure to make court-ordered
temporary support payments or failure to obey the court's temporary order restricting the
use of community assets may also justify a disproportionate award from the community
estate. See Jones v. Jones, 699 S.W.2d 583, 585 (Tex.App.--Texarkana 1985, no writ). 
Income tax liability may also be considered in dividing the community estate. See Baccus
v. Baccus, 808 S.W.2d 694, 700 (Tex.App.--Beaumont 1991, no writ).

 The parties do not dispute the trial court's characterization of the property at issue,
but do assign different values to specific items and dispute the character of money
received from Edna. In its final decree, the trial court awarded the following property to
Peggy: their house in Plainview valued at $126,000, most household furnishings, a bank
account containing $350, and a 1989 Oldsmobile with an approximate value of $2,500. 
The court imposed the following liabilities on her: a $5,512 mortgage on the house,
property taxes of $3,215, various credit card accounts totaling $3,629, and any obligation
that might be owed to John Skaggs. (1) Jerry was awarded a 1995 pickup valued at $9,500,
farm equipment worth $50,000, two center-pivot sprinklers valued at $30,845, a horse
purchased for $2,500, interests in three agricultural concerns totaling about $39,000, and
two antique vehicles worth over $20,000. Debts assigned to Jerry included a loan on the
pickup of $6,100, loans from the Farm Credit Bank of $90,045, tax liability for the 1996 tax
year of $73,167, credit card debt of $19,500, and the judgment in favor of Edna in the
amount of $219,000. Peggy was also awarded a judgment against Jerry in the amount of
$43,867 for the amounts he was required to pay in temporary support but did not do.

 Based upon the assets and liabilities for which values were ascertainable, the trial
court's division resulted in Peggy receiving approximately $97,000 in net assets while Jerry
was awarded a net liability of $254,000, in addition to the money judgment of $43,867.

 In its findings of fact and conclusions of law, the trial court gave ten reasons
supporting the disproportionate division of the marital estate. They were a) Jerry's fault in
the breakup of the marriage, b) his greater earning capacity, c) Peggy's need for future
support, d) her continuing health problems, e) the size and nature of Jerry's separate
estate, f) Jerry's expected inheritance, g) the nature of the property involved in the division,
h) Jerry's failure to follow the court's orders, i) the nature of the community debts, including
income tax liability, and j) Peggy's right of reimbursement. Jerry does not address the
factors individually, nor does he challenge that type of factor as being relevant to a division
of property. Rather, as we have noted, he simply contends that the evidence supporting
those factors is not sufficient to justify the trial court's property division. Thus, we must
consider the evidence supporting each of the trial court findings.

FAULT

 When asked for an explanation of the breakup of the marriage, Peggy simply stated,
"we're two different people," and that she was a people person and Jerry was not. She
also stated that he resented her spending time with her children and he would not
accompany her on visits to her family. There was also evidence that Jerry would hide
alcohol around the house, but she did not introduce evidence of specific problems caused
by his drinking. There was also evidence of a close relationship between Peggy and
another man that caused stress on the marital relationship. Jerry introduced an assumed
romantic note from Peggy to the man. However, both Peggy and the man denied the
relationship was anything other than a longstanding friendship.

EARNING CAPACITY

 The findings as to Jerry's greater earning capacity, Peggy's need for future support
and her continuing health problems are interrelated. The evidence showed that Jerry had
ceased active participation in farming, his primary occupation. He testified that he could
no longer obtain the necessary financing to do so. He did have social security income of
$1,000 per month and rental income of $500 per month from a duplex occupied by his
mother, although he had not actually received any rental income for several months. He
also owned farmland that generated some unspecified income. At the time of trial, he
planned to rent the property for grazing purposes. There was no evidence on what other
job skills Jerry had or his potential income.

 With regard to Peggy's earning capacity, she received Social Security benefits of
about $300 per month. She argues on appeal that her "outdated business skills and
continuing health problems precluded gainful employment." Her trial testimony was that
she had worked in record keeping and had studied for her real estate license, but that she
would not go back to either of those occupations. This evidence would support an
inference that her employment opportunities would be limited; however, there was no other
evidence that she could not obtain employment because of her health.

SIZE AND NATURE OF JERRY'S SEPARATE ESTATE

 The evidence of Jerry's separate estate included 205 acres in Castro County, the
duplex in Hale County, and 47 items of farm equipment which he described as being
obsolete and of very little value. The trial evidence showed that the Castro County land
was valued at $159,000. It does not show the value of the other real property. The
property was used as security for loans from the Farm Credit Bank amounting to more than
$60,000. Although the evidence on Peggy's separate property was limited, it supports the
finding that the separate property only includes her right to reimbursement for contributions
to their home.

JERRY'S EXPECTED INHERITANCE

 The only evidence of an expected inheritance was that Jerry was an only child,
which would support an inference that he had a reasonable expectation of inheriting his
mother's property. However, Jerry averred that it was equally likely that Edna would give
a substantial portion of her estate to Jerry's children. The evidence showed that Edna
owned three tracts of irrigated farmland totaling 1100 acres, and a house was located on
one of the tracts. Edna also owned a house located near a lake in Del Rio. Although he
had seen some of his mother's financial statements, Jerry said he did not know what other
financial assets she possessed.

NATURE OF THE PROPERTY INVOLVED IN THE DIVISION

 Peggy argues that the award to her of the marital residence is justified by the
evidence that Jerry was living in a residence owned by his mother. She also reasons that
it was appropriate to award the farm equipment to Jerry because of his background in
farming. 

FAILURE TO COMPLY WITH COURT ORDERS

 Peggy argues that the evidence shows she lost the cash value of a life insurance
policy because mail "disappeared" from her mailbox. She contends the court "may
attribute the loss to Jerry's failure to adhere to a court order." The order in question
precluded the parties from diverting mail. However, nothing in the record supports her
conclusion.

 When asked about the policy, Peggy testified:

 When I was staying at Matt's, (2) a lot of mail was disappearing out of my
mailbox. I was not getting the things I was supposed to get and so I didn't
know what was going on. . . . I changed my address to Matt's address on my
life insurance. The policy lapsed because they sent it to the address and
Matt had moved, but I had it in care of Matt so I've been fighting them ever
since.


That evidence is not sufficient to support a reasonable inference that Jerry violated the
court's order by having something to do with the disappearance of the letter. The trial court
found that Jerry failed to make the support payments ordered by it but, in its final decree,
included a separate recovery to Peggy for the amount of the deficiency.

THE NATURE OF THE COMMUNITY LIABILITIES

 The record supports Peggy's contention that the 1996 income tax liability is
attributable to Jerry's conduct. Jerry testified that he ordinarily consulted with an
accountant concerning tax implications before selling crops. However, he admitted, in
1996, he "simply forgot" to consider the tax consequences of another crop sale that year.

 With regard to the community debt owed to Edna, Peggy argues it was correctly
awarded to Jerry because 1) the payments were not actually loans but were an advance
on his inheritance, and 2) although Peggy challenged the validity of debts that were barred
by limitations, Jerry acknowledged them. However, when the trial court rendered judgment
in favor of Edna, it resolved any factual dispute as to the nature of the payments. Because
the record does not show that either party challenged the judgment, we must, therefore,
consider the judgment as a valid community debt. Indeed, when being examined about
the payments, Peggy was asked, "[a]re there any of them (the payments) that you dispute
that the money was loaned to you by Mrs. [Edna] Young, to you and Jerry?" She
responded, "I've seen the figures, yes, if that's what you mean, but I've never been given
a description of anything." The context of her testimony indicates that by her use of the
word "description," she meant a description of the purpose of the loans.

 In her discussion of this issue, Peggy does not address the $90,000 liability to the
Farm Credit Bank other than her statements that Jerry had greater earning capacity. The
record itself does not clearly show how the proceeds of the loans were used, but it does
show they are secured by Jerry's separate real property. 

PEGGY'S RIGHT TO REIMBURSEMENT

 There was undisputed evidence that $20,000 of Peggy's separate property was
used to purchase the community property residence. There was also evidence that a
classic Ford Model A car was Jerry's separate property, but had almost no value before
the marriage. Its value was enhanced by being rebuilt by Jerry during the marriage using
community assets. The court treated the vehicle as community property and awarded it
to Jerry. Jerry has not challenged the characterization as community property. 

 In summary, the record does not support the finding of fact that a disproportionate
division is supported by fault in the breakup of the marriage, Jerry's failure to follow court
orders, or the nature of the loans from the Farm Credit Bank. The evidence gives some
support to the findings of Jerry's greater earning capacity and Peggy's need for support. 
It gives significant support for the findings as to Jerry's greater separate property estate,
expected inheritance, and the nature of the community assets. Peggy's right of
reimbursement for contribution to the purchase of the couple's home is undisputed and we
have accounted for that right by only including the community property interest in the house
in considering the assets awarded to her.

 The more difficult determination is the degree to which the record supports the
allocation of community liabilities. In his testimony, Jerry admitted he bears responsibility
for failing to plan for the 1996 tax liability. The record is simply incomplete on the nature
of the loans from the Farm Credit Bank and, under this record, their allocation to Jerry must
be supported by other factors. Although the evidence considering the debt to Edna might
otherwise support a finding that the payments creating the debt were gifts rather than
loans, that question is foreclosed to us by the trial court's finding that they were loans by
its rendition of judgment for Edna.

 Jerry cites cases in which our sister courts have found much less disparate divisions
to have been improper. These include Zamora v. Zamora, 611 S. W. 2d 660 (Tex.Civ.
App.--Corpus Christi 1980, no writ). In that case, the court held that a disposition of
community property resulting in a net award of $27,700 to the wife and an unspecified
negative award to the husband was "grossly unequal" and an abuse of discretion, even
though the husband had the greater income. In Welch v. Welch, 694 S.W.2d 374 (Tex.
App.--Houston [14th Dist.] 1985, no writ), the trial court's division of the community estate
resulted in the wife receiving $93,000 and the husband receiving net liabilities totaling
$23,000. The evidence showed the husband had a master's degree and operated a
struggling business and the wife had income of $1,200 per month. Id. at 376. The
appellate court held there was a gross disparity between the awards and the division was
an abuse of discretion. Id.

 In response, Peggy cites two cases which, she argues, support a disparate division
of the type before us. Johnson v. Johnson, 948 S.W.2d 835, 837 (Tex.App.--San Antonio
1997, writ denied), involved a claim of inequitable division because the trial court awarded
the couple's vehicle to the wife, but the debt was awarded to the husband which, under the
evidence, could only be satisfied out of the husband's property. Id. at 837. In affirming
that award, the court noted that the wife had entered into the marriage with a car, which
had been sold by the husband without the wife's consent after the divorce had been filed,
and that the husband had a monthly income of $10,000 while the wife had no income. Id.
at 836. Those facts distinguish Johnson from this case.

 Peggy also cites Abernathy v. Fehlis, 911 S.W.2d 845 (Tex.App.--Austin 1995, no
writ), in which the court affirmed an award that resulted in the wife receiving $52,000 of
community property, primarily a $42,000 house, while the husband was assigned property
and liabilities resulting in a net liability to him of $35,589. However, $43,000 of the debt
assigned to the husband was a note to his father, which was later assigned to the husband
as his separate property by the executor of the father's estate. Id. at 846. In considering
those facts, the appellate court commented that the proposition that the husband was
required to pay that debt was a "patent fiction" because "he cannot enforce any obligation
against himself." Id. at 847. That being true, the appellate court concluded the division
was sustainable.

 Considering the facts in the case before us, even discounting the 1996 tax debt as
attributable to Jerry's error, the net award to him is approximately a negative $180,000,
while Peggy was awarded almost $100,000 in net assets. Considering the authorities and
the evidence we have discussed, even under the standard we must apply, we hold the trial
court erred in its division of the community estate. We must, therefore, sustain Jerry's first
point and reverse the judgment of the trial court giving rise to this appeal and remand that
portion of the cause to the trial court.

 Because the question may likely arise again after our remand retrial on the property
division, we will briefly address Jerry's second point of error. In that point, he argues that
the imposition of a net liability upon him results in an impermissible divestiture of his
separate property. In advancing that proposition, he relies on the general rule explicated
in Cameron v. Cameron, 641 S.W.2d 210, 215 (Tex. 1982), that a court may not divest a
spouse of separate property on divorce. However, that court did not address the specific
question as to whether an allocation of debt in excess of community property amounts to
an impermissible divestiture of separate property. However, in the Johnson case, the San
Antonio court was presented with that very question and decided it adversely to Jerry's
position. 948 S.W.2d at 838. We agree with our sister court that in many instances, a
couple's debts may exceed the value of their community assets and in those instances, the
payment of the community debts after a divorce will always require the use of separate
funds. Nevertheless, those debts should be paid and, if the parties cannot agree as to
their payment, it is the duty of a trial court to enter an appropriate order. Thus, a proper
allocation of community debts does not cross the bar of the rule stated in Cameron. Jerry's
second point is overruled.

 In his third point, Jerry challenges the separate award of $43,800 to Peggy for his
failure to pay the temporary support payments ordered by the trial court. In doing so, he
contends the evidence was both legally and factually insufficient to sustain that award in
that the temporary orders did not actually require him to make any payments to Peggy, but
rather only required him to "assume responsibility" for specified expenses totaling $2,788
per month. Thus, he reasons, he was only required to indemnify Peggy for expenses she
actually incurred and the evidence does not establish that she incurred the full expenses
during the temporary support periods. However, Jerry made no such objection to the trial
court and thus failed to preserve the question for our review. Tex. R. App. P. 33.1.

 The portion of the trial court's judgment dividing the community property is reversed
and remanded for a new trial, and in all other respects the judgment is affirmed. 


 John T. Boyd

 Chief Justice

Do not publish.



 
1. The evidence showed John Skaggs provided financial support to Peggy while the
divorce was pending. The amount of the support was not established.
2. Although the record is not clear, apparently Matt is Peggy's son.



rder-bottom:solid windowtext 1.0pt;
mso-border-bottom-alt:solid windowtext .5pt;padding:0in 0in 1.0pt 0in;
margin-left:2.0in;margin-right:2.0in'>

 

 



 

 

CHRISTOPHER JAMES HARPER, APPELLANT

 

V.

 

THE STATE OF TEXAS,  APPELLEE 



 

 



 

 FROM THE 54TH DISTRICT
COURT OF McLENNAN COUNTY;

 

NO. 2009-1398-C2; HONORABLE MATT JOHNSON, JUDGE



 

 



 

Before HANCOCK and PIRTLE, JJ., and BOYD, S.J.[1]

 

 

OPINION

            Appellant, Christopher James Harper,
pled guilty in open court to intentionally or knowingly possessing a usable
quantity of marijuana in an amount of five pounds or less but more than four
ounces and was sentenced to fifteen months confinement pursuant to a plea
agreement.[2]  In his single point of error, Appellant
asserts the trial court erred by denying his motion to suppress the marijuana
seized pursuant to a warrantless stop and search of a vehicle.  We affirm.

Background

            In
November 2009, a McLennan County Grand Jury returned an indictment charging
Appellant with the state jail felony offense of intentionally or knowingly possessing
a usable quantity of marijuana.  In
January 2010, Appellant filed a motion to suppress all evidence recovered prior
to his arrest contending the arresting officer extended the traffic stop beyond
a reasonable time necessary to address the reason for the initial stop.  

            At the suppression hearing, Corporal
Craig Bouse, of the City of Woodway Police Department, testified to the
following:  Appellant was a passenger in
a vehicle that was stopped for a defective brake light.  As Officer Bouse was standing by the driver's
door, he detected the odor of alcoholic beverages coming from inside the vehicle.  After he had returned to his patrol vehicle
to check for warrants, Officer Bouse discovered that the license of the driver
had been suspended and was expired.  He
called for backup and made contact with the driver.  He asked the driver to step out of the vehicle
and wait in front of his patrol vehicle. 
Officer Bouse was unable to detect an odor of alcohol coming from the
driver.  When asked by Officer Bouse, the
driver denied knowledge of any open containers of alcohol[3]
or illegal contraband in the vehicle.  

            Officer Bouse then approached
Appellant.  He had already run
Appellant's history and was aware that Appellant's driver's license had been
expired for several years and he had multiple drug-related charges in the
past.  Officer Bouse asked Appellant
about open containers and the consumption of alcoholic beverages.  Appellant responded that he had consumed
approximately five beers and indicated there was an open container beside his
seat.  Officer Bouse asked Appellant to
get out of the vehicle and informed him that he was going to perform a probable
cause search.  He then asked Appellant
whether there was anything else in the vehicle he should know about and told
Appellant that now would be the time to come clean.  At that point, Appellant admitted there was
marijuana inside the vehicle.  

            As Officer Bouse searched the vehicle,
he found an open can of beer and observed a white plastic bag under the
passenger seat that appeared to contain marijuana.  He ran his drug-detecting dog around the vehicle
and the dog alerted.  Officer Bouse then
searched the vehicle and found a large bag of marijuana and a small marijuana blunt
in a cigarette container. 

            In February 2010, the trial court
denied Appellant's motion to suppress. 
Following an abatement of Appellant's appeal, the trial court issued its
Findings And Conclusions Of Fact And Law
in February 2011.  In its findings, the
trial court determined that Officer Bouse had probable cause to investigate the
odor of alcoholic beverage he detected while speaking with the driver and that,
during his investigation, Appellant indicated there was marijuana in the vehicle,
whereupon Officer Bouse had probable cause to investigate whether the vehicle
contained marijuana.  The trial court
concluded that the stop, ensuing search and Appellant's arrest did not violate
Appellant's legal rights.    

            In February 2010, Appellant pled
guilty in open court to the offense for which he was indicted pursuant to a
plea agreement that permitted him to reserve his right to appeal the trial
court's denial of his motion to suppress. 
He was then sentenced to fifteen months confinement.  This appeal followed.

Discussion

            Appellant
asserts that he was improperly detained and the discovery of the marijuana was
a result of his illegal detention.  He
contends that Officer Bouse should have written him a citation for having an
open container in the vehicle after he informed the officer of the open
container beside his seat and then ended Appellant's detention without
searching the vehicle.  He also asserts that
he was coerced into making the admission that there was marijuana in the vehicle
by the officer's prior statement that he was going to search the vehicle for
open containers.  The State counters that
Officer Bouse lawfully detained Appellant pursuant to a traffic stop and, after
smelling the alcoholic beverage, developed a reasonable suspicion sufficient to
justify a search of the vehicle and its occupants.  During that investigation, Appellant admitted
there was an open container of alcohol and marijuana in the vehicle.  With this information, Officer Bouse was
justified in detaining Appellant while he searched the vehicle for an open
container and marijuana.         

            Standard
of Review

            We review a trial court's ruling on
a motion to suppress evidence under a bifurcated standard of review.  Amador
v. State, 221 S.W.3d 666, 673 (Tex.Crim.App. 2007).  In reviewing the trial court's decision, we
do not engage in our own factual review. 
Romero v. State, 800 S.W.2d
539, 543 (Tex.Crim.App. 1990).  The trial
judge is the sole trier of fact and judge of the credibility of the witnesses
and the weight to be given their testimony. 
Wiede v. State, 214 S.W.3d 17,
24-25 (Tex.Crim.App. 2007).  Therefore,
we give almost total deference to the trial court's rulings on (1) questions of
historical fact, even if the trial court's determination of those facts was not
based on an evaluation of credibility and demeanor, and (2)
application-of-law-to-fact questions that turn on an evaluation of credibility
and demeanor.  Amador, 221 S.W.3d at 673.  When
application-of-law-to-fact questions do not turn on credibility and demeanor of
witnesses, however, we review the trial court's rulings on those questions de novo. 
Id.

            Further, when reviewing the trial
court's ruling on a motion to suppress, we must view the evidence in the light
most favorable to the trial court's ruling. 
Wiede, 214 S.W.3d at 24; State v. Kelly, 204 S.W.3d 808, 818
(Tex.Crim.App. 2006).  When the trial
court makes explicit fact findings, as it did here, we determine whether the
evidence, when viewed in a light most favorable to the trial court's ruling,
supports those fact findings.  Id.   We then review the trial court's legal ruling de novo unless its explicit fact
findings that are supported by the record are also dispositive of the legal
ruling.  Id.  Finally, we must uphold
the trial court's ruling if it is supported by the record and correct under any
theory of law applicable to the case.  State v. Stevens, 235 S.W.3d 736, 740
(Tex.Crim.App. 2007).

            Search
and Seizure

            The Fourth Amendment protects
against unreasonable searches and seizures by government officials.  U.S. amend IV; Wiede, 214 S.W.3d at 24.  To
suppress evidence because of an alleged Fourth Amendment violation, the
defendant bears the initial burden of producing evidence that rebuts the presumption
of proper police conduct and satisfies this burden by establishing that a
search or seizure occurred without a warrant.  Amador, 221 S.W.3d at 672.  Once
the defendant has made this showing, the burden of proof shifts to the State,
which is then required to establish that the search or seizure was conducted
pursuant to a warrant or was reasonable. 
Id. at 672-73; Torres v. State, 182 S.W.3d 899, 902
(Tex.Crim.App. 2005). 

            An investigative detention is
reasonable, and thus constitutional, if (1) the officer's action was justified
at the detention's inception, and (2) the detention was reasonably related in
scope to the circumstances that justified the interference in the first place.  Terry
v. Ohio, 392 U.S. 1, 19-20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).  For the officer's initial action to be
justified under the first Terry prong,
we ask whether there existed specific, articulable facts that, taken together
with rational inferences from those facts, reasonably warranted that
intrusion.  Id. at 21.  Specifically, the
officer must have a reasonable suspicion that some activity out of the ordinary
is occurring or has occurred, some suggestion to connect the detainee with the
unusual activity, and some indication that the unusual activity is related to a
crime.  See Davis v. State, 947 S.W.2d 240, 244 (Tex.Crim.App. 1997). 

            Under the second Terry prong, an investigative detention
must be temporary and last no longer than necessary to effectuate the purpose
of the stop.  See Kothe v. State, 152 S.W.3d 54, 63 (Tex.Crim.App. 2004).  The scope of the seizure must also be
restricted to that necessary to fulfill the seizure's purpose.  Florida
v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).  Once the reason for a routine traffic stop is resolved, the
stop may not then be used as a A>fishing expedition for unrelated
criminal activity.=@ 
Davis, 947 S.W.2d at 243 (quoting
Ohio v. Robinette, 519 U.S. 33, 41, 117 S.Ct. 417, 422, 136 L.Ed.2d
347 (1996) (Ginsburg, J., concurring)). 
Rather, reasonable suspicion that another offense was or is being
committed is required to prolong the detention. 
Lambeth v. State, 221 S.W.3d 831, 836 (Tex.App.--Fort Worth 2007,
pet. refused); McQuarters v. State, 58 S.W.3d 250, 256 (Tex.App.--Fort
Worth 2001, pet. refused).  The officer
must be able to point to specific articulable facts, which, based on his
experience and personal knowledge coupled with logical inferences drawn from these
facts, warrant the additional intrusion. 
Davis, 947 S.W.2d at 244. 
An officer is entitled to rely on all the information obtained during
his contact with a motorist in developing the articulable facts justifying
continued detention.  Razo v. State, 577
S.W.2d 709, 711 (Tex.Crim.App. 1979); Powell v. State, 5 S.W.3d 369, 377
(Tex.App.--Texarkana 1999, pet. refused). 


            Here, when Officer Bouse first spoke
to the driver and detected the odor of alcohol emanating from the vehicle, he
formed a reasonable suspicion there was an open container of alcoholic beverage
in the vehicle and commenced an investigation. 
After he eliminated the driver as the source of the odor, he then
shifted his investigation to Appellant. 
When questioned about open containers, Appellant admitted he had
consumed five beers and there was an open container in the vehicle.[4]
  At this point, Officer Bouse had
probable cause to believe an open container violation was being committed and
had authority to conduct a warrantless search of the vehicle for open containers.

            Officer Bouse asked Appellant to get
out of the vehicle and correctly informed him that he was going to do a
probable cause search of the vehicle for open containers.  He next asked Appellant whether there was
anything else in the vehicle he should know about and told Appellant that now
was the time to come clean.[5]  Appellant then admitted there was marijuana
inside the vehicle.[6]  At this point, in addition to probable cause
to search the vehicle for open containers, Officer Bouse had probable cause to
search the vehicle for marijuana.  When
Officer Bouse subsequently searched the vehicle, he found an open container
(can of beer) and, under the passenger seat, a large plastic bag containing
marijuana and a small marijuana cigarette. 
Once the marijuana was discovered, Officer Bouse had probable cause to
arrest Appellant for the offense underlying his conviction. 

            We find that the trial court did not
abuse its discretion in denying Appellant's motion to suppress.  At the very least, the trial court's ruling
is within the zone of reasonable disagreement. 
Accordingly, we overrule Appellant's single point of error.

Conclusion

            The
trial court's judgment is affirmed.    

 

                                                                                    Patrick
A. Pirtle

                                                                                          Justice

Publish.











[1]Hon.
John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by
assignment.  Tex. Gov't Code Ann. §
75.002.(a)(1) (West 2005).

 





[2]See Tex. Health & Safety Code Ann. §
481.121(a), (b)(3) (West 2010).





[3]A
person commits the offense if the person knowingly possesses an open container
in a passenger area of a motor vehicle that is located on a public
highway.  See Tex. Penal Code Ann. § 49.031(b) (West 2011). 





[4]At
this point, Appellant asserts Officer Bouse should have written him a citation
for an open container violation and ended Appellant's detention.  However, Officer Bouse had simply heard that there was an open container
in the vehicle, he had not verified its existence by conducting a search or
collected the open container as evidence. 
Appellant's reliance on the dissent in Ford v. State, 305 S.W.3d 530 (Tex.Crim.App. 2009) (Myers, J.,
dissenting), is misplaced.  In Ford, Justice Myers's dissent asserts
that the officer did not have probable cause to believe the defendant's vehicle contained contraband because he
knew with certainty that the
defendant's vehicle contained evidence of an open container violation, i.e.,
the officer observed three open beer cans prior to any search of the vehicle.  Id.
at 545.  Because the officer had already
observed the open beer cans, Justice Myers concluded in his dissent that there
was no need to commence a search for "additional alcohol because possession
of one or more open containers in a single-criminal episode is a single
offense."  Id.  In our case, Officer
Bouse did not discover an open container until he performed his search.   

    





[5]These
sorts of question can be asked during the traffic stop or after the purpose for
the traffic stop has been effectuated.  Strauss v. State, 121 S.W.3d 486, 491
(Tex.App.--Amarillo 2003, pet. ref'd) (Regardless whether the purpose of the
traffic stop has been effectuated, the officer may still ask if the occupants
possess illegal contraband and solicit consent to search.).    

 





[6]Appellant
asserts that he was coerced into confessing there was marijuana in the vehicle
because of Officer Bouse's prior statement that he was going to do a probable
cause search of the vehicle for open containers.  Our review of the record yields no evidence
of coercion, i.e., physical mistreatment, use of violence, threats, threats of
violence, promises or inducements, deception or trickery.  See Meekins
v. State, 340 S.W.3d 454, 460 n.26 (Tex.Crim.App. 2011) (quoting United States v. Pena, 143 F.3d 1363,
1367 (10th Cir. 1998)).